### 29455. THE STATE v. YOUNG.

HALL, Justice.

We granted certiorari in this case to determine the extent to which the Fourth Amendment right against unreasonable searches and seizures and the associated exclusionary rule could be invoked by a minor student of a public high school to secure the suppression in a pending criminal prosecution of marijuana found upon his person by an assistant principal conducting a personal search not without cause but with less than probable cause for a search by a law enforcement officer.

The Court of Appeals ruled that the assistant principal was a government agent, and concluded that his search of the student violated the Fourth Amendment and that the student's motion to suppress the marijuana should therefore have been granted. *Young v. State,* 132 Ga. App. 790 (209 SE2d 96). The Court of Appeals wrote that ". . . we cannot, in view of the Fourth Amendment, grant a school official, when acting as a governmental agent, greater rights than an ordinary policeman would have with reference to searching a student in his charge." Upon consideration of the knotty issue presented by this appeal, we reverse, holding that the exclusionary rule would not apply even if the Fourth Amendment had been violated, but that in any event no Fourth Amendment violation occurred here.

The search in question was made after the assistant principal observed Young, a seventeen-year-old student, on the premises of the public school he attended. Young was with two other students during school hours and as the principal approached "one of the fellows jumped up and put something down, ran his hand in his pants." The three students were then directed to empty their pockets and Young produced marijuana. Young's motion to suppress this evidence was denied, and he was convicted in Fulton Criminal Court of a misdemeanor. He argues here that his Fourth Amendment rights were violated,

and that he was entitled to suppression of the marijuana.

1. In broad outline, the Fourth Amendment right to be free from unreasonable searches and seizures, though initially applicable only against the federal government, was applied to the states under the due process clause of the Fourteenth Amendment in Wolf v. Colorado, 338 U. S. 25 (1949). The exclusionary rule, allowing suppression of evidence seized in violation of the Fourth Amendment, was first created in Weeks v. United States, 232 U. S. 383 (1914) and applied only in the federal courts. It was extended to state proceedings in Mapp v. Ohio, 367 U. S. 643 (81 SC 1684, 6 LE2d 1081, 84 ALR2d 933) (1961). However, in the case of Burdeau v. McDowell, 256 U. S. 465 (41 SC 574, 65 LE2d 1048) (1921) the Supreme Court ruled that the Fourth Amendment, though textually not so limited, actually afforded protection only against unreasonable searches and seizures made by governmental officers. Therefore, however unreasonable a search by a private person may be, absent participation by governmental agents the Fourth Amendment is totally uninvolved and the evidence, though illegally seized by private individuals, is admissible in a criminal prosecution. Id. In sum, because the Fourteenth Amendment, through which the Fourth Amendment applies to the states, requires state action, absent some state action in a search context there can be no Fourth Amendment violation.

Turning from the Fourth Amendment to the separate consideration of the exclusionary rule, that rule never applies in the absence of a Fourth Amendment violation, and sometimes does not apply when such violation occurs. See United States v. Calandra, 414 U. S. 338 (94 SC 613, 38 LE2d 561) (1974). The application of the exclusionary rule has never been sanctioned by the Supreme Court in any context other than a Fourth Amendment violation by law enforcement officers—not merely "state action," but a special kind of state (or federal) action. "Nor has any court extended the rule of the Weeks case so far as to hold that the Fourth Amendment requires the exclusion of evidence obtained through a search in which there was no participation or instigation by a federal or state *law enforcement* officer."

United States v. Coles, 302 FSupp. 99, 103 (N. D. Me. 1969). (Emphasis supplied.)

The first step in any analysis is to recognize the separation between the Fourth Amendment and the associated exclusionary rule: They are not co-extensive. The Fourth Amendment requires only state action; the latter requires state law enforcement action. Moreover, with respect to both the scope of the Fourth Amendment protections and the sweep of the exclusionary rule, the proper test is a balancing test. In the Fourth Amendment area, in determining the reasonableness of a search, the social utility of the search must be balanced against the individual's reasonable expectation of privacy. United States v. Edwards, 498 F2d 496, 500 (2d Cir. 1974); United States v. Rogers, 388 FSupp. 298 (E. D. Va. 1975). "Unfortunately, there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." Camara v. Municipal Court, 387 U. S. 523, 536 (87 SC 1727, 18 LE2d 930) (1967). This balance sometimes is struck in favor of allowing searches which could not be justified under more typical circumstances. Such searches are approved as reasonable, and therefore as comporting with the Fourth Amendment, because the necessity for the kind of search made is weighed heavily in the balance against the expectation of privacy. Such searches were approved, for example, in Camara v. Municipal Court, supra (governmental safety and health inspections of private premises without probable cause to believe a violation has occurred in the premises to be searched); Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968) (police need to investigate—stop and frisk); United States v. Edwards, 498 F2d 496 (2d Cir. 1974) (airline boarding searches); Steigler v. Anderson, 496 F2d 793 (3d Cir. 1974) (fireman's search for embers); United States v. Nevarez-Alcantar, 495 F2d 678 (10th Cir. 1974) (border crossing searches); United States v. Rogers, 388 FSupp. 298, supra (military type search of civilian employee approved though not meeting usual civilian standards); United States v. Coles, 302 FSupp. 99 (N. D. Me. 1969) (search of Job Corps attendee by federal official charged with maintaining discipline); *State v. Swift,* 232

Ga. 535 (roadblocks); *Ridley v. State,* 232 Ga. 646 (in-prison searches). This list, though long, does not by any means detail all of the special situations recognized by the Fourth Amendment.

After application of the foregoing standards to determine whether a Fourth Amendment violation has occurred, if such a violation is found, the expected benefits and the expected detriments of applying the exclusionary rule must be weighed to determine whether that rule may be invoked to suppress the fruits of the search. United States v. Calandra, 414 U. S., supra, p. 349. There is nothing sacrosanct about the exclusionary rule; it is not embedded in the constitution and it is not a personal constitutional right: "In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." Id., 414 U. S. 348. The Supreme Court has as much as suggested that the rule might be abandoned altogether if statistics should bear out the suspicion that in its primary, and perhaps sole, purpose of deterring future police misconduct, it is ineffective. See id., 414 U. S. 348 n. 5.

"The Robinson [94 SC 467], Gustafson [94 SC 488] and Calandra cases indicate a distinct shift in the attitude of the majority of the Supreme Court in evaluating whether the exclusionary rule should be extended to additional contexts involving illegal searches and seizures. The majority's failure to extend the rule in these cases, as well as the implication discussed previously of making the deterrent effect of the rule the sole justification for its application, suggest that the majority agree with the findings of the rule's critics. Furthermore, the court's actions imply that presented with the proper case and statistical backing to prove the rule's ineffectiveness, it might analyze the deterrent benefit of the rule in criminal trials and find that the costs of the rule outweigh its benefits." Note, Death Knell of the Exclusionary Rule? 1 Hastings Const. L. Q. 179, 212 (1974). See also Dallin H. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chicago L. Rev. 665 (1970); Charles Alan Wright, Must the

Criminal Go Free if the Constable Blunders? 50 Tex. L. Rev. 736 (1972); Senate Bill 2657, 92d Cong., 1st Sess., as amended, entitled A Bill "To amend Title 18 of the United States Code to define and limit the exclusionary rule in Federal Criminal proceedings." The Seventh Circuit has recently refused to extend the application of the exclusionary rule in federal courts to situations in which there was a mere failure to comply with all aspects of Rule 41 Fed. R. Crim. P. concerning searches. United States v. Harrington, 504 F2d 130 (7th Cir. 1974). That circuit, noting that Calandra had pointed the way, has also refused to apply the rule to bar introduction in civil cases of evidence illegally seized by state officers. Honeycutt v. Aetna Ins. Co., 510 F2d 340 (7th Cir. 1975).

It is true that in Georgia the exclusionary rule enjoys a somewhat firmer status, being embedded in our statutory law. Code Ann. § 27-313. However, this Code section applies only to searches and seizures made by peace officers, and therefore has no application to the facts before us. The presence of the statute does mean, however, that in the event the Supreme Court should abolish the rule, it would take a further Act of the Georgia legislature to remove it from the body of our state law. But in all consideration of the exclusionary rule and its impact, "It is well to remember that when incriminating evidence is found on a suspect and that evidence is then suppressed, 'the pain of suppression is felt, not by the inanimate State or by some penitent policeman, but by the offender's next victims.' " In re State in the Interest of G. C., 121 N. J. Super. 108 (296 A2d 102) (1972).

2. Against this background we turn to a consideration of the issues of student searches now before us. From jurisdictions all over the country have come cases delineating the rights of public school students against their school officials in a search context. See also William G. Buss, The Fourth Amendment and Searches of Students in Public Schools, 59 Iowa L. Rev. 739 (1974). Almost all these cases have decided that evidence seized by such officials is admissible; however, the theories have varied. Many courts have concluded that public school officials are not "government agents" within the meaning of the Fourth Amendment, thus avoiding entirely any

possibility of a constitutional violation and any possibility of the exclusion of evidence. E.g., In re W., 29 Cal. App. 3d 777 (105 Cal. Rptr. 775) (1973); Mercer v. State, 450 SW2d 715 (Tex. Civ. App. 1970); Ranniger v. State, 460 SW2d 181 (Tex. 1970); People v. Stewart, 63 Misc. 2d 601 (313 NYS2d 253) (1970); In re Donaldson, 269 Cal. App. 2d 509 (75 Cal. Rptr. 220) (1969). Several other courts have concluded that school officials are government agents, but that their actions were reasonable in the light of the lowered standard, sometimes called the "reasonable suspicion" standard, which the amendment required of them; and thus the standard was not violated and the exclusionary rule was not applicable. E.g., In re State in the interest of G. C., 121 N. J. Super. 108 (296 A2d 102) (1972); In re C., 26 Cal. App. 3d 320 (102 Cal. Rptr. 682) (1972); State v. Baccino, 282 A2d 869 (Del. Super. 1971). Still others have admitted the evidence upon an unclear theory. Louisiana has applied full Fourth Amendment and exclusionary rule protections in the public school search situation. Louisiana v. Mora, La. Sup. Ct. 54884, decided January 21, 1975.

We find that these cases in the main have failed to separate the issues with sufficient sensitivity to delineate comprehensively the rights we are considering. They have tended to divide those making searches, for purposes of the Fourth Amendment, into two groups: private persons, and government agents. We conclude that there are really three groups: private persons; governmental agents whose conduct is state action invoking the Fourth Amendment; and governmental *law enforcement* agents for whose violations of the Fourth Amendment the exclusionary rule will be applied.

With reference to searches by private persons, there is no Fourth Amendment prohibition and therefore no occasion for applying the exclusionary rule. Burdeau v. McDowell, supra. The third group, law enforcement officers, of course, are bound by the full panoply of Fourth Amendment rights and are subject to the application of the exclusionary rule. But the intermediate group, including public school officials, plainly are state officers whose action is state action bringing the Fourth Amendment into play; but they are not state law

enforcement officials, with respect to whom the exclusionary rule is applied.

In explanation of our conclusion that these three categories exist separately, we think it too plain to be controverted that public school officials are state officers acting under color of law, whose action is therefore state action which must comport with the Fourth Amendment standards applicable to the given situation. "If an individual is possessed by state authority, and purports to act under that authority, his action is state action." Griffin v. Maryland, 378 U. S. 130, 135 (84 SC 1770, 12 LE2d 754) (1964). However, the mere fact that action is taken by state officials is not adequate to invoke the exclusionary rule even if that action violates the Fourth Amendment. As we noted above, the exclusionary rule does not reach so far as does the Fourth Amendment and the rule has not been applied save to action taken by law enforcement personnel. The tide is turning, we think properly, away from the exclusionary rule; and we decline to extend it to apply to searches by non-law enforcement persons. There can be no serious contention that public school officials are law enforcement personnel. Therefore, it follows that although school officials are governmental officers subject to some Fourth Amendment limitations in searching their students, should they violate those limitations the exclusionary rule would not be available to the students to exclude from evidence items illegally seized. Instead, for the violation of their constitutional rights the students would be relegated to such other remedies as the law affords them, whether by actions based upon a claimed violation of their civil rights by state officers, or by some tort claim seeking damages.

Though what we have written is sufficient to decide that the marijuana found on Young was not subject to suppression at his trial regardless of whether the search violated his constitutional rights, this case raises additionally a sensitive issue concerning the allowable scope under the Fourth Amendment of a schoolhouse search of a student conducted by a public primary or secondary school official, entirely without the participation of law enforcement officers. We rule that on the facts before us no Fourth Amendment violation

occurred in the search by the assistant principal.

As we have seen, the allowable scope of a search is not absolute, but varies with varying circumstances as we balance fundamentally competing interests. In determining the reasonableness of a search, we must "first . . . focus upon the governmental interest which allegedly justified official intrusion upon the constitutionally protected interest of the private citizen." Camara v. Municipal Court, 387 U. S., supra, p. 534. There are governmental interests of discipline, security, and enablement of the education function, to be served by allowing searches of students by the officials charged with their education and control. Primarily, these searches are not undertaken in any law enforcement capacity but are designed to allow enforcement of multiple rules, regulations and prohibitions which are imposed to maintain an atmosphere of security and calm necessary to allow education to take place. This may and does involve controlling students' behavior, and it may and does involve controlling the deleterious items they are allowed to possess on the premises. Such a deleterious item may be as relatively innocuous as a secreted noise-maker; it may be as dangerous as heroin or a handgun. In both examples the administrators are functioning within their legitimate area of concern in seeking to root out such disturbances and evils; and they must be allowed the latitude to make effective searches to that end.

The law recognizes that students through the secondary school grades do not have the maturity of the adult citizen. To the end that they may be formed and educated, they are subject to the control of others in various circumstances. The citizen on the street is subject only to the restraints of the criminal law; but the student in school is subject additionally to all reasonable school rules and regulations. The administrators to whom we accord the right to make such rules and regulations must be allowed to enforce them. See generally, Note, Balancing In Loco Parentis and the Constitution, 26 U. Fla. L. Rev. 271 (1974).

Though we consider here only the rights of younger persons, the student's subjection to proper authority accompanies him to college. "[I]f the regulation—or, in

the absence of a regulation, the action of the college authorities—is necessary in aid of the basic responsibility of the institution regarding discipline and the maintenance of an 'educational atmosphere' then it will be presumed facially reasonable despite the fact that it may infringe to some extent on the outer bounds of the Fourth Amendment rights of students." Moore v. Student Affairs Comm. of Troy State U., 284 FSupp. 725, 729 (M. D. Ala. 1968).

It is true that unlike the citizen crossing the border, boarding the airplane or attending the Job Corps center—all situations allowing unusually great latitude in searches—the student is not voluntarily at school. In Georgia, he must attend between the ages of 7 and 16. Ga. L. 1945, p. 343 as amended (Code Ann. § 32-2104). It is urged that this involuntary presence at school argues for according to him a higher level of Fourth Amendment protection. We cannot agree. It is not merely the unruly or criminal student who is involuntarily in school. All the other students are there involuntarily also, and are forced to associate with the criminal few—or perhaps merely the immature and unwise few—closely and daily. The state owes those students a safe and secure environment. Searches of students directed to that end are reasonable under the Fourth Amendment on considerably less than probable cause. We conclude that in the good faith exercise of their public trust teachers and administrators must be allowed to search without hindrance or delay subject only to the most minimal restraints necessary to insure that students are not whimsically stripped of personal privacy and subjected to petty tyranny. The search we consider here met this minimal standard.

What we have written is entirely in line with the construction which the Supreme Court has put upon constitutional rights of non-adults. "[E]ven where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults'. . . The well-being of its children is of course a subject within the state's constitutional power to regulate. . . [P]arents and others, teachers for example, who have this primary responsibility for children's well-being are entitled to the support of laws

designed to aid discharge of that responsibility." Ginsberg v. New York, 390 U. S. 629, 638-640 (88 SC 1274, 20 LE2d 195). For example, without violating the First Amendment, governments may control the materials to which children have access, though such control as to adults would be unconstitutional. Id., p. 643.

The Supreme Court has, of course, written that neither teachers nor students "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Independent Comm. School Dist., 393 U. S. 503, 506 (89 SC 733, 21 LE2d 731) (1969). However, the rights of students recognized by that case were a dilute version of those accorded adults. In Tinker, the court carefully limited the First Amendment freedom it was prepared to recognize in students: "But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Id., p. 513. We know of no comparable limitation on the First Amendment freedoms of adults. Similarly, in Goss v. Lopez, 43 USLW 4181 (January 22, 1975), a student's Fifth Amendment right to procedural due process before suspension was recognized; but the opinion requires only a fairly casual, on the spot, and not necessarily lengthy, conversation between the student and the accusing official. Again, this is a dilute version of the procedural due process required in other areas. Cases such as In re Gault, 387 U. S. 1 (87 SC 1428, 18 LE2d 527) (1967), which deals with juveniles but does not concern a school setting, are inapplicable to the issues considered here.

Very recently, a three-judge federal court ruled that the need for teachers to accomplish the essential purpose of maintaining discipline was sufficiently strong to authorize the use of reasonable corporal punishment of students even over the objections of the student's parents. This decision, though it required minimal procedural due process in the Goss vein, recognized the power the state must be permitted to exercise over the person of the student in order to accomplish its valid state ends. Baker

v. Owen, 43 USLW 2451 (M. D. N. C., April 23, 1975).

In short, we see no conflict between the Supreme Court's rulings and our decision today that the restraints placed by the Fourth Amendment on schoolhouse searches by school officials are minimal. It is not necessary to decide what good faith conduct by a searching teacher or official would fail to meet that standard, because the students' acts in the case before us, involving a furtive gesture and an obvious consciousness of guilt by these students at the approach of the assistant principal, clearly gave him adequate reason for the searches he made. The search of Young was entirely proper under the Fourth Amendment. Young has suffered no abridgment of his Fourth Amendment right to be free from *unreasonable* searches and seizures. The search made here was reasonable under the standard we announce today.

We do not anticipate that our ruling will encourage school officials to make of themselves largely unfettered searching agents of law enforcement officers. We emphasize that the standards announced here for action by school officials will pass constitutional muster only if those officials are acting in their proper capacity and the search is free of involvement by law enforcement personnel. Cf. Corngold v. United States, 367 F2d 1 (9th Cir. 1966).

In conclusion, to reiterate our ruling today, granting that public primary and secondary school students have minimal Fourth Amendment rights to be free from searches and seizures by school officials, nonetheless the exclusionary rule is not applicable to enforce those rights, and students aggrieved by the action of their officials must fall back upon such other legal remedies as applicable law may allow them.

The trial court properly denied Young's motion to suppress the marijuana, and the Court of Appeals erred in reversing that court's judgment.

*The judgment of the Court of Appeals is reversed. All the Justices concur, except Jordan, J., who concurs specially, Ingram, J., who concurs in Division 2 and the judgment and Gunter, J., who dissents.*

ARGUED JANUARY 17, 1975 — DECIDED MAY 20, 1975 — REHEARING DENIED JUNE 2, 1975.

*Hinson McAuliffe, Solicitor General, Thomas R. Moran, Assistant Solicitor General,* for appellant.

*Al Horn, Lawrence L. Schneider,* for appellee.

*Arthur K. Bolton, Attorney General, Lois F. Oakley, Deputy Assistant Attorney General.*

*Thomas Taylor Purdom,* amicus curiae.

JORDAN, Justice, concurring specially.

I concur in the judgment of reversal but not necessarily in all that is said in the opinion. For the purpose of this decision, I can assume that school officials while enforcing state policy and school regulations come within the sphere of the Fourth Amendment and still reach the same result as the majority under the facts of this case.

In my opinion the action of the assistant principal was clearly reasonable under the lower standard of reasonableness applicable to a school community situation. A school official stands in loco parentis to the student under his authority. In the performance of his duties he must be allowed reasonable bounds for the preservation of order and discipline.

As stated in the majority opinion the scope of Fourth Amendment protection is a "balancing test." In the school community situation I would apply a minimal standard of "reasonable suspicion" rather than the broader "probable cause" standard applicable to routine law enforcement situations.

Under such a test there was no Fourth Amendment violation in this case and the trial court did not err in overruling the motion to suppress the evidence resulting from the search.

GUNTER, Justice, dissenting.

The Court today denies a public school student his right to suppress evidence obtained by the government through an unconstitutional search and seizure. This is a right accorded to all Georgia citizens, and I therefore

think this right cannot be denied to a student in Georgia's public school system. I agree with the decision of the Georgia Court of Appeals when it decided this case and said: "Therefore, we hold that when a student is searched by a school official which results in criminal prosecution the student must have been afforded the Fourth Amendment rights accorded to every other citizen." *Young v. State,* 132 Ga. App. 790, 791.

I dissent and would affirm the judgment of the Court of Appeals.

The Fourth Amendment stands as a bulwark between the government and a citizen. It means that the government, federal or state or local, which can act only through its agents-employees, cannot invade the person of a citizen by conducting an "unreasonable search and seizure." The Fourth Amendment, as well as its equivalent in the Georgia Constitution, reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; . . ."

In Camara v. Municipal Court, 387 U. S. 523 (1967), the Supreme Court of the United States held that the Fourth Amendment was applicable to a municipal housing inspector. Mr. Justice White, the author of the Court's opinion in that case, said: "The basic purpose of this Amendment, as recognized in countless decisions of this court, is to safeguard the privacy and security of individuals against arbitrary invasions by *governmental officials.*" P. 528. At p. 534 he said: "In summary, we hold that *administrative searches* of the kind at issue here are significant intrusions upon the interests protected by the Fourth Amendment, . . ." And at p. 539 he said that the approach taken by the court in that case "best fulfills the historic purpose behind the constitutional right to be free from unreasonable *government invasions* of privacy."

In See v. City of Seattle, 387 U. S. 541 (1967), the Supreme Court of the United States held the prohibition of the Fourth Amendment applicable to a representative of the City of Seattle Fire Department. The See case and the Camara case were decided on the same date, June 5, 1967.

In a case decided somewhat earlier, West Virginia

Bd. of Ed. v. Barnette, 319 U. S. 624 (1943), the Supreme Court of the United States said (p. 637): "The Fourteenth Amendment, as now applied to the States, protects the citizen against the state itself and all of its creatures — boards of education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."

School administrators are considered government officials for purposes of the First Amendment and procedural due process requirements. See Tinker v. Des Moines &c. School District, 393 U. S. 503 (1969); Goss v. Lopez, 43 USLW 4181 (January 22, 1975). And it is now clearly established that a minor, whether a public school student or not, is a person under our Constitution and entitled to its protections. See Tinker and Goss, supra, and In Re Gault, 387 U. S. 1 (1967).

In Georgia, an assistant school principal is clearly an agent-employee of the state or local government. He is therefore subject to the proscriptions of the Fourth Amendment, and a public school student is a person entitled to the benefits of the Fourth Amendment.

I.

The Constitutional Right To Suppression.

It must be noted in the beginning that though the majority and I discuss the same subject-matter, we use different descriptive terms. The majority calls what we are talking about the "Exclusionary Rule"; I call it the "Constitutional Right to Suppression." The difference in these two descriptive phrases points up the basic, substantive difference in the viewpoint of the majority and my viewpoint on this subject.

I was a practicing lawyer in 1961 when the Supreme Court of the United States decided the landmark case of Mapp v. Ohio, 367 U. S. 643 (81 SC 1684, 6 LE2d 1081, 84 ALR2d 933). I was convinced then, as I am now, that Mapp held that the Constitution conferred a constitutional

right of suppression upon the victim of an unconstitutional seizure who was being criminally prosecuted in a state court.

The plurality opinion in Mapp discussed Boyd v. United States, 116 U. S. 616 (1886), Weeks v. United States, 232 U. S. 383 (1914), and quoted from Olmstead v. United States, 277 U. S. 438 (1928). Referring to the Boyd case the Mapp plurality opinion said: "Concluding, the court specifically referred to *the use* of the evidence there seized as 'unconstitutional.' " P. 647. In referring to the Weeks case the Mapp plurality opinion said: "Thus, in the year 1914, in the Weeks case, this court 'for the first time' held that 'in a federal prosecution the Fourth Amendment *barred* the use of evidence secured through an illegal search and seizure.' " P. 648. The Mapp plurality opinion quoted from Olmstead: "The striking outcome of the Weeks case and those which followed it was the sweeping declaration that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really *forbade* its introduction if obtained by government officers through a violation of the Amendment." P. 649.

Mapp then held: "Today we once again examine Wolf's documentation of the right to privacy free from unreasonable state intrusion, and, after its dozen years on our books, are led by it to close the only courtroom door remaining open to evidence secured by official lawlessness and flagrant abuse of that basic right, reserved to all persons as a specific guarantee against that very same unlawful conduct. We hold that all evidence obtained by searches and seizures in violation of the Constitution is, *by that same authority,* inadmissible in a state court." Pp. 654, 655.

Then at p. 660 the Mapp plurality opinion said: "Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the states, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police

officer who, in the name of law enforcement itself, chooses to suspend its enjoyment."

Four Justices joined the Mapp plurality opinion, but a fifth Justice, Mr. Justice Black, plainly held in his concurrence that the Constitution *required* the rejection of the unconstitutionally seized evidence. Mr. Justice Black said that the evidence must be rejected on the basis of the Fourth and Fifth Amendments, the Boyd doctrine. Concluding his concurring opinion, he said: "The court's opinion, in my judgment, dissipates the doubt and uncertainty in this field of constitutional law and I am persuaded, for this and other reasons stated, to depart from my prior views, to accept the Boyd doctrine as controlling in this state case and to join the court's judgment and opinion which are in accordance with that constitutional doctrine." P. 666.

Mr. Justice Stewart concurred in the judgment of reversal effected by the plurality opinion and the concurring opinion of Mr. Justice Black, but he said: "I express no view as to the merits of the constitutional issue which the court today decides." P. 672. His vote for reversal of the state court judgment was predicated on substantive due process required by the Fourteenth Amendment.

Mr. Justice Harlan dissented, joined by Mr. Justice Frankfurter and Mr. Justice Whitaker. But in his dissenting opinion, Mr. Justice Harlan acknowledged that the reversal of the state court judgment by the plurality of four and Mr. Justice Black "derives not from the 'supervisory power' of this court over the federal judicial system, *but from constitutional requirement*. This is so because no one, I suppose, would suggest that this Court possesses any general supervisory power over the state courts." P. 678.

Therefore, it seems to me that all nine members of the court acknowledged that the Mapp decision was dictated "by Constitutional requirement." And if the Constitution *requires* the rejection of illegally seized evidence in a state criminal prosecution, the prosecuted party, if he was the victim of the unconstitutional seizure, has a right to invoke the Mapp "constitutional requirement."

I realize that the opponents of the "constitutional

right to suppression" declared by Mapp have, ever since the rendition of that declaration, attempted to belittle the constitutional right by calling it an evidentiary rule of exclusion enforced by the courts for deterrent purposes, or a suppression doctrine, or a rule that is judicially implied and applied. These efforts totally ignore the fact that in Mapp five Justices held that the Constitution *required* suppression. And it is my view that to abolish the Mapp "constitutional requirement," Mapp must be overruled.

Chief Justice Burger in his dissenting opinion in Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388 (1971), said: "The exclusionary rule has also been justified on the theory that the relationship between the Self-Incrimination Clause of the Fifth Amendment and the Fourth Amendment requires the suppression of evidence seized in violation of the latter. [Cits.] Even ignoring, however, the decisions of this court that have held that the Fifth Amendment applies only to 'testimonial' disclosures, United States v. Wade, 388 U. S. 218, 221-223 (1967); Schmerber v. California, 384 U. S. 757, 764 and n. 8 (1966), it seems clear that the Self-Incrimination Clause does not protect a person from the seizure of evidence that is incriminating." P. 414. This argument completely ignores the fact that Mr. Justice Black, the tipper of the constitutional scale in Mapp, dissented in both Wade and Schmerber, his position being that the evidence procured in those two cases was both "testimonial" and "communicative" evidence. Wade at p. 245 (opinion of Black, J.). This argument also ignores the fact that Mr. Justice Black's position was: "The Fifth Amendment in and of itself directly and explicitly commands its own exclusionary rule — a defendant cannot be compelled to give evidence against himself." Cooledge v. New Hampshire, 403 U. S. 443, 498 (opinion of Black, J.).

Also, the Chief Justice in his Bivens dissent indicated that in order to abandon what he calls the "suppression doctrine" it would be necessary for the court to overrule Weeks and Mapp. And it is clear that he, at that time, did not propose to do so. He said: "To overrule Weeks and Mapp, even assuming the court was now prepared to take that step, could raise yet new problems."

Bivens, pp. 420, 421 (Burger, C. J., dissenting).

Mr. Justice Harlan, also an opponent of the "constitutional requirement" declaration of Mapp, indicated in his concurring opinion in Cooledge v. New Hampshire, 403 U. S. 443 (1971), that to overhaul the law of search and seizure it would be necessary to overrule Mapp. He said: "I would begin this process of re-evaluation by overruling Mapp v. Ohio, 367 U. S. 643 (1961), and Ker v. California, 374 U. S. 23 (1963)." P. 490.

United States v. Calandra, 414 U. S. 338 (1974), was a grand jury case, not a criminal prosecution against the victim of an unconstitutional seizure. Calandra did not overrule Mapp. Mr. Justice Powell, the author of Calandra seems to me to have said that what he calls the "exclusionary rule" would not be extended to a grand jury investigation, but that it would be maintained and enforced in a federal or state criminal prosecution against the victim of the unconstitutional seizure. I must confess that I am at a loss to understand how the Supreme Court of the United States can promulgate and enforce a rule of evidence in the judicial systems of the fifty states. I do not understand that the Supreme Court has "supervisory power" over the state judicial systems that it does over the lower federal courts. And neither do I understand how a quasi-constitutional rule of deterrence can be promulgated by the Supreme Court and enforced in the courts of the fifty states. If the Supreme Court of the United States has that power, our federal system, as we have heretofore known it, has been drastically altered, and we now have a unitary system in which the United States Supreme Court can utter and enforce evidentiary rules or deterrent policies of admission or exclusion.

In Ker v. California, 374 U. S. 23, 31, the Supreme Court of the United States said: "Mapp, however, established no assumption by this court of supervisory authority over state courts." If Mapp did not establish an evidentiary rule of exclusion, what did it do? My answer is that Mapp enforced a right of suppression accorded to a seizure-victim by the Constitution.

Mapp has not yet been overruled. I think it held that the Constitution conferred a right of suppression upon the victim of an unconstitutional seizure being criminally

prosecuted in a state court. My position on this subject is approved, affirmed, buttressed, and improved upon by one of the finest efforts of legal scholarship that I have ever encountered. See Schrock and Welsh, "Up from Calandra: The Exclusionary Rule as a Constitutional Requirement," 59 Minn. L. Rev. 251 (December, 1974).

I would hold that this high school student, the respondent here, had a constitutional right to suppress the evidence seized from him in an unconstitutional manner by the school official.

## II.

Georgia's Statutory Right to Suppression.

I further maintain that Georgia has accorded all of its citizens a statutory right to the suppression of unconstitutionally seized evidence if the seizure-victim is being criminally prosecuted by the State. In 1966 the Georgia Legislature enacted a statute entitled "Criminal Procedure—Searches and Seizures." The caption of this Act stated: "An Act to provide procedures for searches and seizures and for suppression of evidence illegally seized; to provide the procedure connected therewith; to repeal Chapter 27-3 of the Code of Georgia relating to search warrants; to repeal conflicting laws; and for other purposes." Ga. L. 1966, p. 567.

Sec. 13 of that Act provided that a defendant aggrieved by an unlawful search and seizure could make a motion to suppress the items that he contended to have been illegally seized. It provided that the trial judge should hear evidence to determine the motion; it provided that the burden of proving that the search and seizure were lawful is on the State; and it further provided that if the trial judge granted the motion, the seized items would "not be admissible in evidence against the movant in any trial."

This statute accorded a seizure-victim a right of judicial review and a right of suppression. It acknowledged that the right to a "fair prosecution" by the State is an integral part of a "fair trial" conducted by the State. It further recognized that the retention by the State and the prosecutorial use by the State of items that had been originally seized in an unconstitutional manner were a continuing violation of the original constitutional

infraction.

The majority says that this statute has no application in this case because it applies only to "searches and seizures made by peace officers." I say that this statute establishes the criminal procedure to be used in the Georgia criminal courts, and that it is applicable to all agents of the State, whether they be peace officers, school officials, or municipal fire or public health inspectors.

In short, I think that the majority has watered down a statutory, procedural and substantive right to suppression accorded to all seizure-victims prosecuted criminally by the State.

III.
The Standard of Reasonableness to be Applied in the Public School System.

The majority concedes that "probable cause," the standard applicable in searches of citizens by law enforcement officers, did not exist for the search of the student in this case. The analysis of the majority also suggests that the search of a student in a public school by a law enforcement officer without "probable cause" would result in suppression of the evidence even under an evidentiary rule of exclusion. The "probable cause" standard is applicable to the police search but not to the search by the school official.

The majority asserts that searches of students in public schools by school officials "are reasonable under the Fourth Amendment on considerably less than probable cause. We conclude that in the good faith exercise of their public trust teachers and administrators must be allowed to search without hindrance or delay subject only to the most minimal restraints necessary to insure that students are not whimsically stripped of personal privacy and subjected to petty tyranny."

My view, of course, is that there must be "probable cause" for the search of a student in a public school by a school official, and such a search without "probable cause" violates the Fourth Amendment rights of a student as a citizen. A student, in my view, cannot be stripped of his Fourth Amendment rights at the entrance to the public school. Nor do I think that the Fourth Amendment rights

of a high school student are a diluted version of the Fourth Amendment rights of an adult.

There can be no doubt that the need for order and discipline in a public school is a valid concern; but it must be conceded that the maintenance of order and discipline in a public school is one thing, and the acknowledgement and enforcement of constitutional rights in a criminal prosecution is an entirely different thing. This case has nothing to do with the maintenance of school discipline; the State is prosecuting a student for having committed an alleged crime; the student is entitled to a "fair prosecution" which is an integral part of a "fair trial"; if an adult had been searched by a government official in the manner that this student was searched, the adult would have, as the majority concedes, a right to suppress any item seized; the adult is entitled to a fair prosecution as an integral part of a fair trial, but a student is not; and all of this adds up to making a public school student a second-class citizen not entitled to a fair prosecution by the State in a fair trial conducted by the State.

In the context of criminal prosecutions where Fourth Amendment rights must be acknowledged and enforced, I would hold that the standard of reasonableness for the search of a public school student is the same standard that must be applied to searches of adults, "probable cause."

I do not think that students have mere "minimal Fourth Amendment rights." And I certainly do not subscribe to the "adequate reason for the searches" enunciated by the majority in this case. As quoted from the majority opinion, the acts of the students in this case involved at most "a furtive gesture and an obvious consciousness of guilt by these students at the approach of the assistant principal." In fact, the record shows only that one of three students jumped up and put his hand down his pants. All three were searched. The record does not show whether the student in the present case was the one who jumped up. The majority's standard, subjectively applied by a school official, will justify the search of the person of any student in a public school. Such a standard is really no standard at all.

The majority has arrived at its standard by a general balancing test. The majority has placed upon the scales

the age of the student, the status of the student, the status of the administrator, the fact that the search occurred in the schoolhouse, and the "governmental interests of discipline, security, and enablement of the education function." But why each of these considerations is relevant for purposes of the Fourth Amendment and what weight each brings to the scales remain unclear.

For example, the majority stresses the age of the student, citing Ginsburg v. New York for the general proposition that children have lesser constitutional rights than adults. It may be that in some First Amendment contexts the age of a person is relevant to the constitutional balance. Yet nobody has suggested that a high school student standing on the street has less freedom from governmental intrusions upon his privacy than an adult standing beside him. The relevance of age to Fourth Amendment problems is hard to perceive. Similarly, the fact that the search occurred in the schoolhouse cannot bring much weight to the scales if police in the schoolhouse are held to full warrant and probable cause requirements; and the courts addressing this issue here have so held. Piazzola v. Watkins, 442 F2d 284 (5th Cir. 1971); Waters v. United States, 311 A2d 835 (DC App. 1973); People v. Bowers, 72 Misc. 2d 800 (339 NYS2d 783) (NYC Crim Ct. 1973) affd. 77 Misc. 2d 697 (356 NYS2d 432) (App. Div. 1974).

What then are the relevant considerations? As the majority states, it is necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interest of the private citizen. Most searches are made in vindication of the State's interest in enforcing the criminal law, which includes, of course, an interest in protecting law abiding citizens from lawless ones. Ordinarily, a lower standard than probable cause is justified only when some additional interest is involved. Even then, the nature and extent of the governmental intrusion must be considered as well as the necessity for the particular form of intrusion. If the governmental interests can be served by a limited intrusion, then the Fourth Amendment permits only the limited intrusion. Terry v. Ohio, 392 U.S. 1 (1968); Camara v. Municipal Court, supra; United States v.

Skipwith, 482 F2d 1272 (5th Cir. 1973).

The reasoning of the majority places no limits on the nature and extent of the search a school official may make, as long as the search is justified in the first instance under the majority's "minimal standard." Furthermore, the facts of the case do not show a limited intrusion of the kind associated with the relaxed standards of reasonableness in Camara and Terry. The search here was personal in nature and aimed at the discovery of evidence of specific misconduct. See Camara, 387 U. S. p. 537. Compare Sibron v. New York, 392 U. S. 40 (1968), where emptying a suspect's pocket was not justified by the same considerations which justified a pat-down search in Terry.

The governmental considerations said to be in issue are not very convincing in the context of this case. The facts give not the slightest hint of any threat to "the enablement of the education function" in the conduct of the students before the search. If we are to restrict a student's privacy in his own person in the name of education, let us do so on a record which provides evidence of potential disruption or disorder. There is none here. Compare Tinker v. Des Moines School District, supra, 393 U. S., p. 511. Furthermore, in the context of the present case, the government's interest in discipline and security is indistinguishable from the general law enforcement interest. See Buss, "The Fourth Amendment and Searches of Students in Public Schools," 59 Iowa L. Rev. 739 (1974).

What of the special status of the school official? Most courts ruling on schoolhouse searches have stressed this factor, noting that at common law school officials are said to stand in loco parentis. The majority here correctly avoids reliance on common law maxims, although much of the reasoning has the same familiar ring. It cannot be doubted that a school official occupies a status different from a police officer for many purposes. But the school official also has essentially law enforcement re-sponsibilities. When he acts upon a suspicion of specific misconduct and conducts an investigation he is per-forming a law enforcement function. "What so many of the courts persist in talking about as a parental

relationship between school and the student is really a law enforcement relationship in which the general student society is protected from the harms of anti-social conduct. As such, it should be subjected to law enforcement rules. Besides presenting a false picture of a person acting in a parental fashion, casting the school administrator in the parental role diverts attention from the relevant considerations that might argue for or against permitting the search." Buss, supra, at p. 768.

The schoolhouse search presents a unique situation. The question is whether its unique aspects reduce high school students to second-class citizens under the Fourth Amendment. I have examined what the case law establishes as the primary considerations under the Fourth Amendment and have tried to examine the facts of this particular case in the light of those considerations. I conclude that a school official performing a law enforcement function, conducted a search of the person. I find no basis on this record for relieving the official of the probable cause requirement. Furthermore, I conclude that a search of three students after one of them jumps up and puts his hand down his pants is unreasonable.

Underlying the position of the majority in this case is a concern about the potential civil liability of school officials for violations of Fourth Amendment rights. The answer to that problem is not to apply a watered-down Fourth Amendment standard in criminal prosecutions but to recognize a qualified immunity for school officials in civil actions. The Supreme Court has recently done just that. Wood v. Strickland, — U. S. —(95 SC —, 43 LE2d 214). (1975). The effect of the present decision is to combine that qualified immunity with a "minimal standard" of reasonableness and an abandonment of the right to suppress evidence. The result is that there is no effective judicial sanction for violations of a high school student's Fourth Amendment rights by a school official.

Conclusion.

The public school student in this case was, in my opinion, the victim of an unconstitutional search and seizure. I think that he had a constitutional right to suppress any item seized, and I further think that he had a statutory right, conferred by the Georgia Legislature, to

suppress any item seized.

The Georgia Court of Appeals ruled in favor of his right to suppression, and I would affirm the judgment.

I respectfully dissent.