## A92A2079. JACKSON v. THE STATE.
(430 SE2d 781)

ANDREWS, Judge.

Sylvia Jackson brings this interlocutory appeal from the trial court's denial of her motions to dismiss the indictment and to suppress evidence. The indictment charges Jackson with possession of cocaine in violation of OCGA § 16-13-30 (a). The trial court refused to suppress evidence supporting the State's case that a blood specimen of her stillborn fetus tested positive for a metabolite of cocaine.

Jackson, who was 24 weeks pregnant, was attacked by her boyfriend. She was struck repeatedly in the face and stomach by her assailant, who knew she was pregnant, and told her that he was going "to make her lose it." Two days later she experienced heavy vaginal bleeding and went to the hospital emergency room. She was "found to have no fetal heart tones and fetal demise." She related the beating to attending physicians and was admitted for further evaluation. The following day she delivered a stillborn fetus. The next day she was presented with and signed a form authorizing the hospital to dispose of the fetus rather than release it to a mortuary. On a different form, she was asked: "Would you like an autopsy done on the deceased?" She responded "no."

The coroner notified the medical examiner of the death and authorized an autopsy for the reason that the stillbirth occurred several days after a reported beating of the mother, which was detailed in a police investigative report. The autopsy was performed "under the provisions of The Georgia Death Investigation Act" and it was concluded from the physical examination of the body that the cause of death was stillbirth. The medical examiner ordered laboratory procedures, submitting to the laboratory the body's liver for toxicology and blood for toxicology and possible typing, pursuant to ascertaining the cause of death. The report of the forensic chemist and the chief toxicologist of the Division of Forensic Sciences of the GBI included the conclusion that the blood specimen was positive for a cocaine metabolite.

Based at least in part upon the evidence of cocaine found in the blood test performed on the stillborn fetus, the grand jury returned an indictment against Jackson, charging that "[she] did possess and have under her control, cocaine."

1. It was not error to refuse to dismiss the indictment, regardless of whether or not the evidence should have been suppressed.

Assuming that the evidence was correctly not suppressed, Jackson contends that she cannot be convicted of possession of cocaine, which possession is based on evidence of a cocaine metabolite having been found in her stillborn fetus' blood following an autopsy purportedly authorized by the Georgia Death Investigation Act and brought

about when defendant was seeking maternal health care.

Her first argument is that this tenuous circumstantial evidence, found not even in her own body, could not constitute "possession" by her, citing *Green v. State*, 260 Ga. 625 (398 SE2d 360) (1990). That is to say, the evidence is insufficient. Her second argument is that the evidence here does not establish criminal "possession" by her, as contemplated by the General Assembly in OCGA § 16-13-30 (a).

The problem with these arguments is twofold. Number one, the indictment does not charge that she possessed cocaine by virtue of its metabolite's presence in the blood of a stillborn fetus delivered of her. It merely charges her with possession of cocaine. The motion to dismiss is essentially a general demurrer, which "challenges the very validity of the indictment." *State v. Eubanks*, 239 Ga. 483, 485 (238 SE2d 38) (1977). The legal sufficiency of the pleading, not the evidence, is the issue. Id. The latter will not be inquired into. *Buchanan v. State*, 215 Ga. 791, 793 (113 SE2d 609) (1960); *Brown v. State*, 121 Ga. App. 228 (173 SE2d 470) (1970).

"The true test of the sufficiency of an indictment . . . is found in the answer to the question: Can the defendant admit the charge as made and still be innocent? If he can, the indictment is fatally defective." *State v. Eubanks*, supra at 485. Obviously, if defendant admits that she possessed cocaine at any time within the period alleged, she would be guilty of the crime.

Secondly, defendant is attempting to use the motion to dismiss as though it were a motion for summary judgment, which does not exist in criminal procedure because, for one thing, the parties cannot be compelled to reveal the evidence on which their positions are based. If by defendant's argument she means that the grand jury could not have indicted her based on this evidence, the record does not disclose what was presented to the grand jury. Even assuming the fetus' blood metabolite evidence was illegal, the burden is on a defendant seeking to quash an indictment to overcome the presumption that it was returned on legal evidence by showing that there was no other competent evidence upon which it could lawfully have been returned. *Meriwether v. State*, 63 Ga. App. 667 (11 SE2d 816) (1940); see also *Brown v. State*, supra.

2. As to Jackson's claim that the blood test results from the stillborn fetus should have been suppressed, the state correctly asserts that no search warrant or consent from Jackson was required for the medical examiner to conduct the autopsy and blood test on the stillborn fetus. "[T]here is no *constitutionally* protected right in a decedent's body. Rather, the courts have evolved the concept of quasi property in recognition of the interests of surviving relatives in the possession and control of decedents' bodies. We do not find this common law concept to be of constitutional dimension." (Emphasis in

original.) *Georgia Lions Eye Bank v. Lavant*, 255 Ga. 60, 61 (335 SE2d 127) (1985). Jackson's quasi-property interest in the stillborn fetus will not support a privacy claim sufficient to implicate the search and seizure provisions of the United States Constitution. A search within the meaning of the Fourth Amendment occurs when a reasonable expectation of privacy has been infringed by state action. *Thomas v. State*, 203 Ga. App. 529, 531 (417 SE2d 353) (1992). "The principal purpose of these constitutional provisions is to protect privacy not property interests. *Warden v. Hayden*, 387 U. S. 294 (87 SC 1642, 18 LE2d 782) (1967)." *Lowe v. State*, 203 Ga. App. 277, 280 (416 SE2d 750) (1992).

Moreover, in light of Jackson's report that she had been severely beaten prior to the stillbirth, the state had a compelling interest in investigating the cause of death. See OCGA § 16-5-80 (offense of feticide). Under the Georgia Death Investigation Act (OCGA § 45-16-20 et seq.) "[w]hen any person dies in any county in this state . . . [a]s a result of violence . . . it shall be the duty of any law enforcement officer or other person having knowledge of such death to notify immediately the coroner or county medical examiner. . . . A coroner or county medical examiner who is notified of [such death] shall order a medical examiner's inquiry of that death." OCGA § 45-16-24 (a) (1), (b). A medical examiner's inquiry is an investigation into the circumstances surrounding such death, and may include an autopsy and other tests and examinations to determine the cause of death. OCGA §§ 45-16-21 (1), (10); 45-16-22 (c); 45-16-25 (c). The blood testing was done as part of the autopsy performed on the stillborn fetus to determine the cause of death. There is no evidence that the death investigation, autopsy, or testing pursuant thereto was a subterfuge to investigate Jackson for possession of cocaine.

Citing *State v. Luster*, 204 Ga. App. 156, 157 (419 SE2d 32) (1992), Jackson contends that the Death Investigation Act does not apply because it refers to the death of a "person" rather than a fetus. *Luster*, supra,[1] Division 1 (physical precedent) held that "the word 'person' in a criminal statute may not be construed to include a fetus unless the legislature has expressly included it, since at common law a fetus was not considered a person." This principle has no application here for two reasons. First, the Death Investigation Act is civil not criminal legislation, and an unborn fetus has been included within the

---

[1] In *Luster* a pregnant woman was charged with both possession of cocaine (OCGA § 16-13-30 (a)), and with distributing or delivering cocaine to her unborn child by ingesting it during her pregnancy in violation of OCGA § 16-13-30 (b). We concluded that the distribution and delivery charge under OCGA § 16-13-30 (b) must be dismissed because the statute on its face and legislative intent indicated it did not apply to those facts. The possession charge under OCGA § 16-13-30 (a) remained.

definition of "person" in various types of civil actions. See *Billingsley v. State*, 183 Ga. App. 850, 851 (360 SE2d 451) (1987). Secondly, the Act was applied here to authorize the autopsy and blood test on the body of a stillborn fetus. Obviously, the Legislature intended for the Act to apply to a stillborn fetus to enable the state to fully investigate the cause of death, especially in cases which may result in a prosecution for feticide. An unborn fetus when stillborn becomes a deceased person within the meaning of the Death Investigation Act.

Assuming, without deciding, that Jackson had a privacy interest in the body of the stillborn fetus sufficient to invoke Fourth Amendment search and seizure protections, this would provide no basis to suppress the blood test results. The exclusionary rule used to suppress evidence seized in illegal search and seizures applies only to Fourth Amendment violations involving law enforcement officers. *State v. Young*, 234 Ga. 488, 489 (216 SE2d 586) (1975). The autopsy and testing done on the fetus, although performed at the state crime lab, was part of the medical examiner's investigation under the Death Investigation Act. "[A]lthough a coroner's inquest [or a medical examiner's investigation] may uncover facts that lead to the prosecution of a person for homicide, OCGA § 45-16-35, a coroner [or medical examiner] has no law enforcement authority such as that given to the Georgia Bureau of Investigation, see OCGA §§ 35-3-4 (b) and 35-3-8, and the Georgia State Patrol, see OCGA §§ 35-2-32 and 35-2-33. In this regard, the verdict of a corner's inquest [or the result of a medical examiner's investigation] is merely advisory to officers charged with the execution of public laws." *Kilgore v. R. W. Page Corp.*, 261 Ga. 410, 411-412 (405 SE2d 655) (1991) (concluding a coroner is not a law enforcement agency for purposes of the Open Meetings Act). Although medical examiners are state officers, whose actions may bring the Fourth Amendment into play where a privacy interest is involved, they are not law enforcement officers to whom the exclusionary rule is applied. See *Young*, supra at 494. In any event, in conducting the autopsy and testing, the medical examiner acted in good faith to carry out duties imposed under the Death Investigation Act to investigate the report of a violent death. Such action taken in reasonable compliance with the Death Investigation Act is a justifiable official intrusion, which does not unreasonably infringe upon any constitutionally protected privacy interest. See *Young*, supra at 494-496.

Moreover, there is no reason to apply the exclusionary rule merely because any law enforcement officer became aware of the blood test results produced in the course of the medical examiner's investigation. The testing was done at the crime lab as part of the investigation undertaken by the medical examiner based on reports that the fetus may have suffered a violent death. As previously noted, there is no indication that the death investigation and testing was a

subterfuge to investigate Jackson for possession of cocaine. Law enforcement officials, who are doing their job in a place where they are entitled to be, are not required to ignore evidence of a criminal offense which appears in the course of their lawful activity. There was no Fourth Amendment violation, since any law enforcement officer, who became aware of the blood test results under these circumstances, was authorized to seize this evidence under the "plain view" doctrine. See *Merriman v. State*, 201 Ga. App. 817, 819 (412 SE2d 598) (1991).

The evidence sought to be excluded was found during an autopsy and accompanying blood test authorized under the Death Investigation Act. There is no reason to exclude this evidence, and the trial court properly denied the motion to suppress.

*Judgment affirmed. Pope, C. J., McMurray, P. J., Birdsong, P. J., Cooper, Johnson and Blackburn, JJ., concur. Beasley, P. J., concurring in part and dissenting in part.*

BEASLEY, Presiding Judge, concurring in part and dissenting in part.

I respectfully dissent with respect to the admissibility of the test results of the fetus' blood. This evidence, considered in Division 2 of the majority opinion, should have been suppressed. I concur in Division 1.

Defendant advances several arguments against admissibility: the autopsy and subsequent blood testing were not authorized by her and thus were subject to the requirement of a search warrant on Fourth Amendment and state constitutional grounds; the Georgia Death Investigation Act did not authorize the procedure because the stillborn fetus, which weighed two pounds eight ounces and was described in the medical report as nonviable, was not a "person" within the meaning of OCGA § 45-16-24 (a).

1. I assume, for the purposes of this case, but do not decide, that the Act embraced "fetus" within the term "person" for purposes of death investigation under the Act. However, this assumption is problematic because of two indicators that it does not cover fetuses.

First, the word "person" is used, and that generally is understood in the law not to include unborn children, except for certain specified purposes. *Billingsley v. State*, 183 Ga. App. 850 (1) (360 SE2d 451) (1987), lists some of these instances, which are in the civil rather than in the criminal realm. *Billingsley* held that an unborn child was not a "person" in the criminal law of Georgia and thus could not be the victim of vehicular homicide under OCGA § 40-6-395.

The Death Investigation Act is not a criminal statute per se, although one of its purposes, and the purpose for which it was used here, is to aid in the enforcement of penal laws. It would not be sub-

ject to the rule that "criminal statutes must be strictly construed against the state and liberally in favor of human liberty." *Knight v. State*, 243 Ga. 770, 775 (2) (257 SE2d 182) (1979). The Act, however, was in derogation of the common law. "[A] statute . . . in derogation of the common law . . . must be strictly construed." *Oviedo v. Connecticut Nat. Bank*, 194 Ga. App. 626 (391 SE2d 417) (1990).

OCGA § 45-16-24 was rewritten in 1990, *after* the adoption of the criminal feticide statute in 1982. Ga. L. 1982, p. 2499, § 1; OCGA § 16-5-80. No accommodation was made for coverage of fetuses by indication of an intention to include them within the word "person" or by specific reference.

The purpose of such investigation would be to determine whether the crime of feticide had been committed. The feticide statute does not view the covered fetus, that is, a "quick" fetus, as a "person" but rather as an "unborn child." Killing it is not homicide, which it would be if the fetus were regarded as a person. The authority for autopsy to aid in investigation of feticide should be coextensive with, and not broader than, the crime which purposes the autopsy. That is, if the criminal statute which gives rise to the need for autopsy does not regard the unborn child as a person, neither should the statute which enables the gathering of evidence to support its prosecution.

Secondly, the Act in three places indicates that the legislature contemplated that only the bodies of born persons would be subject to autopsy under it. In OCGA § 45-16-24 (a) (5), investigative autopsies are authorized when any person dies "In any suspicious or unusual manner, with particular attention to those persons 16 years of age and under." Here would have been a natural place to include fetuses, because the young were being emphasized. Subsection (a) (6) covers any person who dies "After birth but before seven years of age if the death is unexpected or unexplained." Here, it is exclusively the young who are being focused upon, and fetuses, or unborn children, are clearly excluded. The third place is in OCGA § 45-16-27.1, which again refers to the very young and covers only "any person after birth but before 7 years of age." The words "after birth" must be taken as deliberately excluding "before birth," for that is their plain meaning. "The courts must look to the purpose and intent of the legislature and construe law to implement that intent." *Wilson v. Board of Regents*, 246 Ga. 649, 650 (272 SE2d 496) (1980).

2. Nevertheless, even if the rules of statutory construction allow a broadening of the word "person" in the Death Investigation Act to include "fetus" or even "quick fetus" (the latter being the only type subject to the crime of feticide), the search for the blood and its seizure violated the Fourth Amendment to the Constitution of the United States.

I note first that although appellant raised the state constitution

below in a cursory way, she did not pursue this means of protection, did not separately address it, did not obtain a ruling on it, and has cited no cases or theory bottomed on any authority other than the Fourth Amendment. Thus we are constrained to bypass the state constitution as a source of relief. The statute on motions to suppress was not expressly invoked either. See OCGA § 17-5-30. Nevertheless, it controls the procedure, which puts the burden on the state to prove that the search and seizure was lawful. See subsection (b).

It is clear from the record that the autopsy in this case was undertaken to determine whether there was any evidence in or on the body of the fetus which would support a criminal charge that the mother's boyfriend had caused its death by the violence he inflicted. She had told the hospital personnel of the attack on her, and the police had interviewed her about it. The autopsy report states that the "Reason for Performing An Examination" was that the fetus was "reportedly stillborn several days after the mother reports to have received a beating." Note is made that additional details are contained in the police investigative report. The autopsy resulted in the medical examiner's conclusion that "Cause of Death" was "Stillbirth" and that the "Manner of Death" was "Natural." Thus the stated purpose of the autopsy was satisfied, and no evidence of trauma as a cause of death was uncovered. The authorization granted by the Death Investigation Act came to an end.

What, then, authorized the medical examiner to proceed further and submit blood to the State Crime Lab "for toxicology and possible typing" and liver "for toxicology?"[2] There is no evidence, nor even any argument advanced, that the intrusion, extraction and testing were done for any authorized medical reason or to determine the cause of death.

The extraction of blood is a "search" and depends antecedently upon "seizure" within the meaning of the Fourth Amendment. *Schmerber v. California*, 384 U. S. 757, 767 (86 SC 1826, 16 LE2d 908) (1966). In reaching this conclusion, the court wrote: "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State. . . . '[T]he security of one's privacy against arbitrary intrusion by the police' [is] 'at the core of the Fourth Amendment' and 'basic to a free society.' " *Schmerber*, supra. "The ensuing chemical analysis of the [blood] sample to obtain physiological data is a further invasion of . . . privacy interests." *Skinner v. R. Labor Executives' Assn.*, 489 U. S. 602, 616 (109 SC 1402, 103 LE2d 639) (1989).

---

[2] In *Jackson v. State*, 841 SW2d 38 (Tex. App. 1992), the conviction of defendant for possession of cocaine, which was reversed, was based on autopsy revelation that her stillborn infant's liver contained cocaine.

In this case there was a dead fetus, however, not a live person. The purpose of criminal investigation under OCGA § 45-16-24 having been satisfied, the further aspects of autopsy would have to be "consented to by the person assuming custody of the body for the purposes of burial." OCGA § 45-16-28. In this case it would be the mother, appellant.

The mother was confronted with two choices with respect to the body, the day after the stillborn delivery. Her interest in it was acknowledged. She could either direct its release to a mortuary or she could instruct the hospital to "dispose of" it. On the Permit for Removal of Body, she expressly provided that the body was not to be a source of organs, and she answered "no" to the question: "Would you like an autopsy done on the deceased?"

This was a body which, unlike any other dead body, had been physically attached to her own and contained within her own until its delivery. Indeed, the state not only recognizes this but also depends upon it to support its charge that presence of the metabolites in the fetus' body constitutes evidence of possession of the metabolites by the mother. In addition, unlike other physical objects in which appellant had a property interest, it could not be kept, and she had no third alternative as to its custody and control.

When she instructed the medical personnel at the hospital to dispose of the body, it could not have been reasonably understood that such authorization included releasing the body to the State Crime Lab for blood extraction and testing which could reveal whether she had possessed an illicit drug. Disposing of a fetus is one thing; conducting an autopsy and testing its blood is quite another. These consequences of the instruction offered and given would not reasonably have been understood by the average person. This is strengthened by the fact that she was given a choice about autopsy as well as about organ donation, and declined both. Having been given these choices, a reasonable person would expect that if other uses of the body were desired, she would have been given choices regarding them, too.

Nor did her instruction make the hospital her agent, clothed with authority to consent to the blood test portion of the autopsy for criminal investigative purposes, on some theory that the hospital stood in her place under OCGA § 45-16-28 since she chose no burial. This is especially true in light of her choice of no autopsy.

The dead body was "quasi property over which the [mother had] rights which the courts will protect." *Rivers v. Greenwood Cemetery*, 194 Ga. 524, 525 (22 SE2d 134) (1942), quoted in *Georgia Lions Eye Bank v. Lavant*, 255 Ga. 60, 61 (335 SE2d 127) (1985). In this case, her rights were greater than would ordinarily exist in the body of a deceased relative, because she allegedly took into her own body and passed a substance through her own body into the searched body. She

had an expectation of privacy which would not exist in the body of an independent person. She was not advised, when she instructed the hospital to *dispose* of the body, that this would open the door to invasions of that body and the withdrawal of its fluids in search of evidence of what she had had in *her* own body. Thus the testing required *her* consent (or some other authorization such as a search warrant) because it was only she who had a personal stake in its outcome. Cocaine metabolites in the stillborn's blood would be, at best, circumstantial evidence of the mother's possession of cocaine. Even where the substance is found in the urine of the person charged with possession, the evidence is only circumstantial. *Green v. State*, 260 Ga. 625 (1) (398 SE2d 360) (1990).

This case differs from *Georgia Lions Eye Bank*, supra, in the material difference that the statute challenged there authorized the medical action taken. Here the statute invoked by the state did not authorize the blood extraction and test, under the circumstances in which it was applied.

The mother's consent in this case, and what was done pursuant thereto, differ from that in *McCoy v. Ga. Baptist Hospital*, 167 Ga. App. 495 (306 SE2d 746) (1983). There the parents of the stillborn child authorized the hospital "to dispose of this infant in any manner they deem advisable." They also expressly "relinquish[ed] all claims on body of said infant." Id. at 496. Appellant gave no such wholesale "clear and unambiguous" (in the words of *McCoy*) authorization but instead gave instructions to *dispose* of the body and to do so without autopsy, indicating the expectation that disposition would be accomplished and completed *by the Hospital* and it would be done without violating the body. The hospital had a legal duty "to handle the corpse . . . with utmost dignity." *Mayer v. Turner*, 142 Ga. App. 63, 64 (234 SE2d 853) (1977).

*McCoy* also differs materially because it involved a claim for civil liability with respect to how the hospital treated the body in that it kept instead of properly disposing of it, whereas the instant case complains of criminal investigation conducted by an agency other than the one to which the mother gave custody for the express purpose of disposal.

Appellant, by signing the documents referred to above, did not contract away her right to require that, in the absence of a warrant based on probable cause, her consent be obtained before blood was extracted from the body of her stillborn child to determine if it contained an illegal drug for which she could be held criminally liable. Unlike garbage which is left for collection outside the curtilage of a house where it is open to the *public*, in which there is no Fourth Amendment protected expectation of privacy, see *California v. Greenwood*, 486 U. S. 35 (108 SC 1625, 100 LE2d 30) (1988), the

body of a stillborn fetus which the mother entrusts to the hospital to dispose of carries with it the mother's expectation of privacy in its being shielded from search without Death Investigation Act authorization, without probable cause, without exigent circumstances, and without her " 'freely and voluntarily given' " consent, "the product of an essentially free and unrestrained choice by [her]." *Beasley v. State*, 204 Ga. App. 214, 216 (1) (419 SE2d 92) (1992).

The choice appellant was given cannot reasonably be understood to have included the choice to allow the blood test or not. What might be regarded as her "consent" for the hospital to dispose of the body did not contain within its scope the search and seizure conducted here; it expanded the parameters of the "consent" and extended it beyond what could reasonably have been understood. A consent is not necessarily wholesale. See *Graves v. Beto*, 424 F2d 524 (5th Cir. 1970) (blood test); *State v. Diaz*, 191 Ga. App. 830, 832 (2) (383 SE2d 195) (1989). See also *State v. Corley*, 201 Ga. App. 320 (411 SE2d 324) (1991).

A subjective expectation of privacy is reasonable if it is one that society is prepared to recognize as objectively reasonable. *Greenwood*, supra at 39; *Rakas v. Illinois*, 439 U. S. 128, 143-144 (99 SC 421, 58 LE2d 387) (1978); *Skinner*, supra at 616-617. If a person has a right to consent or not to a blood test which might yield evidence of driving under the influence of alcohol or drugs, see OCGA § 40-5-55, then surely a mother's property and privacy interests in the body of her stillborn fetus include the right to consent or not to a test of its blood which might yield evidence of her intake of an illicit drug, which bears much more severe consequences than a conviction for drunk driving. OCGA § 16-13-30.

I therefore conclude that the search and seizure in this case "has infringed an interest . . . which the Fourth Amendment was designed to protect." *Rakas*, supra at 140. Its basic tenet is "to protect personal privacy and dignity against unwarranted intrusion by the state." *Winston v. Lee*, 470 U. S. 753, 760 (II) (105 SC 1611, 84 LE2d 662) (1985). In *Winston*, the Court followed the case-by-case approach taken in *Schmerber* and held that it would violate Lee's Fourth Amendment rights to compel surgery to remove a bullet which could be evidence of his commission of robbery.

In this case, the extraction and testing of the fetus' blood were a violation of the right of the mother to be secure in her "person" and "effects, against unreasonable searches and seizures." U. S. Const., Amend. IV. Because of the nature of the crime charged, i.e., possession of a controlled substance, and the state's theory of how appellant possessed it, the blood testing was indirectly a testing of appellant's body and directly a testing of a body in which she had a property interest. It would be illogical to conclude that the mother had no pri-

vacy or property interest in the stillborn fetus which encompassed the right to consent or not to a test of its blood, but that the results of that test could constitute evidence of the possession of the blood's contents by her. The right of privacy encompasses confidentiality — "the individual interest in avoiding disclosure of personal matters" — as well as autonomy, "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U. S. 589, 599-600 (97 SC 869, 51 LE2d 64) (1977).

The "reasonableness" standard requires " 'a careful balancing of governmental and private interests.' " *Soldal v. Cook County*, 506 U. S. ____ (113 SC 538, 121 LE2d 450, 465) (1992). The government's interest in extracting and testing the blood has not even been articulated, except after the fact when what was found was cocaine metabolites. The interests of the appellant, on the other hand, were at least those identified above.

DECIDED MARCH 19, 1993 —
RECONSIDERATION DENIED APRIL 2, 1993 ▆▆▆▆▆▆▆▆▆

*Michael J. Classens*, for appellant.

*R. Joseph Martin III, District Attorney*, for appellee.

*Mary E. Wyckoff, Gerald R. Weber, Elizabeth J. Appley, Richard L. Greene*, amici curiae.