## A93A1495. JORDAN v. THE STATE.
(438 SE2d 371)

ANDREWS, Judge.

Jordan, convicted of two counts of solicitation to commit murder and two counts of attempt to commit the murders of her husband and her lover's wife, appeals the judgment entered on the jury's verdict.

Viewed in favor of the verdict, the evidence was that Jordan and her husband, Bert, had been married 14 years and had two children. He was an insurance adjuster and she sold Tupperware and had become a manager in the organization. Through her Tupperware activities, Jordan met Bill and Shirley Tucker. Shirley sold Tupperware and Bill attended conventions with her and the Jordans. Several

years prior to the current incident, Bill and Jordan had engaged in an affair which had been discovered by Bert Jordan. He confronted them and Jordan assured Bert that it would not happen again. Bert believed that Jordan had ceased having contact with Bill, although he knew she continued to work with Shirley.

Bert entertained neighbors and friends with a July 4th party in 1990, sometime after discovering the affair. Unknown to him, Jordan had invited both Shirley and Bill Tucker. At this point, Bert became concerned that the affair had rekindled. He placed a tape machine on the telephone in his home office, a phone to which Jordan had access. In monitoring this tape, Bert overheard a conversation between Darla Ridenbaugh and Jordan in which Jordan was discussing overdosing Bert on his heart medication by grinding up some of his pills and placing them in his food. Bert contacted the police.

Ridenbaugh and Jordan had first discussed Jordan's desire that Bert go away in a face-to-face meeting at Ridenbaugh's home. After this conversation, Ridenbaugh was concerned about Jordan's intentions and called her husband at his job to see what she should do. He suggested calling Bert and advising him of this threat or calling Jordan on the telephone to see if she had been serious in her threat. When Ridenbaugh called, Jordan answered the phone and the call taped by Bert occurred. After this call, Ridenbaugh was waiting for her husband's next break on his job so she could call him again. At this point, she was arrested by officers who had obtained a warrant for her arrest as a result of Bert's contact with police. After agreeing to cooperate with the investigation, Ridenbaugh called Jordan from the sheriff's department on July 17, pretending to be at her home. She asked Jordan if she could talk "privately" and Jordan advised Bert was not home. Ridenbaugh told Jordan that she was going to Florida, her home state, the next day and knew a high school classmate who could "take care of your problem," referring to Bert. Jordan then asked "What about Shirley [Tucker]?" Told this was an option, Jordan said they both could not die at once and that, since Bert had double indemnity insurance coverage, he had to die at work. Jordan called Ridenbaugh's home on Wednesday morning July 18 and, when she did not pick up the phone, left this message on the answering machine: "I'm getting ready to leave the house and . . . wanted to leave a message. In regards to your trip to Florida, yes for both, and I'll talk to you about it later."

As a result of this conversation, GBI agent Foster went undercover as "Bobby," Ridenbaugh's friend. A beeper number was given to Ridenbaugh, who provided it to Jordan. On July 18, 1990, Foster was beeped by Jordan around 8:00 p.m. Upon calling the number displayed, Foster spoke to Jordan, advised he was the friend from Florida, and was calling about the "construction job." Arrangements were

made to meet sometime the next day. Later, Ridenbaugh called Jordan with the time and place of the meeting and told her to bring a picture of Bert and Shirley as well as a description of vehicles driven by Bert.

Foster, wearing a recording device, met at Shoney's on Wednesday, July 19, 1990, with Jordan and Ridenbaugh. Bert's work habits and location were discussed, along with the fact that insurance coverage doubled if he died while working. Also, Foster demanded $500 for his time in discussing the matter and the timing of the two killings was discussed. Jordan admitted that she had ground up some of Bert's heart medication, but said she had not done anything with it. Jordan and Foster also discussed Shirley's situation and that she would be alone in her home after school started and her grandchildren, whom she kept, returned to school. They agreed that the first hit would cost $1,500, with $500 paid upfront and $1,000 the day Foster killed Bert, plus a portion of the insurance proceeds. A second $1,000 would be due when Shirley was killed. Jordan was to get the $500, a .38 handgun, and a box of shells for Foster.

Jordan told Foster she wanted him to wait until after August 16 to pursue Bert because Bert was taking their two children to Florida while she went to the Tupperware convention and she wanted the children to have good memories of this time with their father after he was gone.

On Thursday, July 19, 1990, Jordan got money from her Tupperware account and $200 from her son's savings account. She was the only signatory on this account, although Bert made the deposits into it.

Jordan went to a pawn shop recommended by Ridenbaugh. There, she advised the clerk that her husband had been robbed and she was going on a trip to Florida and he wanted her to have a handgun to take with her.[1] She purchased a .38 handgun and a box of shells.

On Friday, July 20, 1990, Jordan met Foster at Shoney's and gave him the gun, the ammunition, and $500. Foster said "I kill your husband the 21st [of August]." Jordan concurred. Shirley was to be killed three or four months later.

After the initial conversation with Ridenbaugh, all meetings and phone conversations were on audio tape and some were videotaped by the police with the permission of Foster and Ridenbaugh.

1. The first two enumerations allege error in the denial of Jordan's motion to suppress evidence derivative of an illegal wiretap and the court's reliance on the inevitable discovery rule to allow the re-

---

[1] Bert Jordan already owned a number of guns, which were kept at their home.

maining tapes into evidence. They will be considered together.

Jordan's motion was premised on Bert Jordan's violation of OCGA § 16-11-62 which prohibits any person in a clandestine manner from overhearing or recording a private conversation. The motion sought the suppression of these original recordings made by Bert Jordan of Ridenbaugh and Jordan's initial telephone conversation. The court granted this portion of the motion and these tapes were not introduced, played, or referred to during the trial.

The motion further alleged that, "absent a showing that the aforementioned electronic surveillance was conducted pursuant to the Omnibus Crime Control and Safe Streets Act (Title III) of 1968 [18 USCA § 2510 et seq.] as well as . . . §§ 16-11-63 through 16-11-69 any reliance on said illegal activity and consequential investigation based on the *fruits* of said illegal activity would be in violation of the Fourth and Fourteenth Amendments of the United States Constitution, Protection of Illegal Search and Seizure. . . ." Jordan urged suppression of all evidence compiled during the undercover investigation as "fruit of the poisonous tree."

The trial court concluded, based on the testimony of Darla Ridenbaugh, that she had already formed the intent to contact the authorities before she was arrested and agreed to cooperate. Therefore, the conversation illegally taped by Mr. Jordan would have inevitably come to the attention of the authorities through a legal source, Ridenbaugh.

(a) First, the differences in the federal and state wiretap statutes must be acknowledged. 18 USCA § 2515 states that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and *no evidence derived therefrom* may be received in evidence in any trial, . . . before any court, . . . of the United States, a State, . . . if the disclosure of that information would be in violation of this chapter." (Emphasis supplied.)

OCGA § 16-11-67, the comparable Georgia provision, states that "[n]o evidence obtained in any manner which violates any of the provisions of this part shall be admissible in any court of this state except to prove violations of this part." No "derivative" language appears in this provision.

Both federal and state provisions provide that, before any law enforcement officer may intercept communications, the statutory steps requiring preliminary judicial approval of such interception must be strictly followed. 18 USCA §§ 2510 through 2520; OCGA §§ 16-11-60 through 16-11-69; *Evans v. State*, 252 Ga. 312, 315 (1) (314 SE2d 421) (1984). When a state or federal agent has improperly procured a wiretap order, or there has been any failure to precisely comply with the requirements for sealing and handling the tapes, the taped evidence is inadmissible, regardless of the good faith of the gov-

ernment agents. E.g., *King v. State*, 262 Ga. 147, 148 (414 SE2d 206) (1992), citing *United States v. Rios*, 495 U. S. 257 (110 SC 1845, 109 LE2d 224) (1990).[2]

Even under the federal provisions, if an improper wiretap is initiated by a private individual without the preknowledge and acquiescence of law enforcement authorities, this will not preclude use by the government of the knowledge obtained thereby. Cf. *United States v. Manning*, 542 F2d 685, 686 (6th Cir. 1976); *United States v. Clegg*, 509 F2d 605, 609 (3), (4) (5th Cir. 1975).

(b) Since, as acknowledged by the parties and the trial court in his order, there was no compliance by Bert Jordan with either the state or federal statutes regarding wiretapping, the inquiry remaining is whether the "fruit of the poisonous tree" doctrine, although not specifically included in the verbiage of OCGA § 16-11-67, nonetheless applies to exclude the remaining tapes and testimony by Ridenbaugh and the undercover agent which were made in compliance with OCGA § 16-11-66.[3]

Jordan's reliance in this regard on *United States v. Vest*, 813 F2d 477 (1st Cir. 1987) and *Ransom v. Ransom*, 253 Ga. 656 (324 SE2d 437) (1985) is not persuasive.

*Ransom* was a divorce case in which the husband had taped the wife's phone conversations with a third party without her knowledge in violation of OCGA § 16-11-62 (4). These tapes were not allowed to be used for any purpose at the divorce trial, including impeachment. Likewise, here, no use at all was allowed to be made of the tape illegally made by Bert Jordan. Also, in *Vest*, a secret tape was made by one co-conspirator in a face-to-face conversation with his police officer co-conspirator regarding payment of a bribe. The trial court granted Vest's motion to suppress the tape in his subsequent perjury trial and the government appealed.

The First Circuit[4] refused to allow use of illegally taped material which had been obtained by private parties without complicity of government agents. As pointed out above, 18 USCA § 2515 includes the additional "no evidence derived therefrom" language. The First Circuit did not accept the argument of the United States based on the

---

[2] Not every failure of government agents to comply with the statutory provisions of Title III, other than those dealing with obtaining the court order and intercepting oral communications, will make the material obtained suppressible. *United States v. Donovan*, 429 U. S. 413, 432 (III) (97 SC 658, 50 LE2d 652) (1977).

[3] Recordings made with the consent of one of the parties to the conversations are not violative of the Georgia statute. *Mitchell v. State*, 239 Ga. 3 (1) (235 SE2d 509) (1977); *Sheppard v. Reid*, 198 Ga. App. 703 (402 SE2d 793) (1991).

[4] *Vest* is merely persuasive authority since rulings of trial and intermediate federal courts are not binding on the trial court or this court. *Head v. State*, 253 Ga. 429, 430 (1) (322 SE2d 228) (1984); *Felker v. State*, 252 Ga. 351, 361 (1b) (314 SE2d 621) (1984).

"private source" exception to the exclusionary rule, discussed infra.

(c) As acknowledged in the wording of her motion to suppress, the genesis of the "poisonous tree" concept is a violation of the Fourth Amendment.

"Turning from the Fourth Amendment to the separate consideration of the exclusionary rule,[5] that rule never applies in the absence of a Fourth Amendment violation, and sometimes does not apply when such violation occurs. [Cit.] The application of the exclusionary rule has never been sanctioned by the [federal] Supreme Court in any context other than a Fourth Amendment violation by law enforcement officers. . . ." (Footnote supplied.) *State v. Young*, 234 Ga. 488, 489 (1) (216 SE2d 586) (1975); *Jackson v. State*, 208 Ga. App. 391, 394 (430 SE2d 781) (1993); *State v. Almand*, 196 Ga. App. 40, 41 (395 SE2d 609) (1990); see *United States v. Ford*, 765 F2d 1088, 1089 (1) (11th Cir. 1985).

"Searches and seizures by private individuals, even if unreasonable, are not prohibited by the Fourth Amendment, absent a showing that the private individual acted as an instrument or agent of the government. [Cits.]" *Britt v. State*, 186 Ga. App. 418, 420 (3) (367 SE2d 298) (1988) (search of unclaimed luggage by airline agent pursuant to airline policy in presence of police officer, evidence admissible). E.g., *Loden v. State*, 199 Ga. App. 683, 687 (1) (406 SE2d 103) (1991) (detention and search of customer by K-Mart loss prevention agent); *Anderson v. State*, 193 Ga. App. 6, 7 (2) (387 SE2d 148) (1989) (opening of package containing drugs by Federal Express agent); *State v. Lovig*, 189 Ga. App. 436 (376 SE2d 229) (1988) (opening of apartment by resident manager for entry by cable repairman tracing illegal splice).

There having been no illegal conduct by state agents involved in Bert Jordan's initial taping, the "fruit of the poisonous tree" doctrine is not applicable to this situation. So holding does not deprive Jordan of the protection of OCGA § 16-11-62 et seq., since filing a complaint against Bert Jordan for the illegal taping is still an option available to her.

(d) Since there was no state participation in the initial taping, the "inevitable discovery rule" relied upon by the trial court is also not applicable. *Barnett v. State*, 204 Ga. App. 491, 494 (1) (420 SE2d 43) (1992).

A ruling of the court below which is right for any reason will be affirmed and the denial of Jordan's motion to suppress is affirmed. *Dorminy v. Dorminy*, 242 Ga. 326 (249 SE2d 49) (1978).

---

[5] The "fruit of the poisonous tree doctrine" is an extension of the exclusionary rule. *Wong Sun v. United States*, 371 U. S. 471 (83 SC 407, 9 LE2d 441) (1963).

2. Jordan's third enumeration claims error in the denial of her motion for mistrial based on the state's failure to disclose exculpatory material.

Jordan did file a pretrial *Brady*[6] motion seeking exculpatory material and the trial court conducted an in-camera review of the file of the district attorney. The court concluded that the only material arguably covered was a summary of Jordan's statement made shortly after her arrest and this was provided to Jordan pre-trial.

During the cross-examination of Agent McCravy at trial, Jordan's counsel asked for and was allowed to review the notes from which the agent was testifying. At that time, counsel became aware that there was a tape recording of the officers' interview with Ridenbaugh after her arrest. The tape was produced and played for Jordan outside the jury's presence and Jordan made a motion for mistrial, contending that Ridenbaugh's expression of disbelief that Jordan was serious about killing Bert was exculpatory and had not been provided.

Pretermitting the issue of whether another's subjective belief as to the intent of the accused is "exculpatory," *Brady* is not violated when the evidence is made available during the trial, as occurred here. *Dennis v. State,* 263 Ga. 257, 259 (5) (430 SE2d 742) (1993); *Moulder v. State,* 207 Ga. App. 335, 337 (5) (427 SE2d 793) (1993). Thereafter, there was no error in the denial of the motion for mistrial on this basis.

3. In her fourth enumeration, Jordan contends that the trial court's recharge on entrapment violated OCGA § 17-8-57.

Defendant's Request to Charge No. 28 dealt with entrapment, OCGA § 16-3-25. During the initial charge to the jury, the court, with the acquiescence of the defense, gave the charge on entrapment contained in Vol. II, Suggested Pattern Jury Instructions, Criminal Cases, pp. 37-38. As the jury was retiring to deliberate, one juror requested a copy of the definition of entrapment and "what entrapment is not." At that juncture, no response was made to the inquiry. After the jury had begun deliberations, the court received a note from the foreperson, the juror who initially asked the question, which stated: "We request a copy of the definition of entrapment including what is not entrapment. This would be very helpful to our deliberations."

Defense counsel initially concurred in the court's decision to orally recharge the standard entrapment charge, but disagreed with the court's addition to that charge of the following: "Entrapment is the seduction or improper inducement to commit a crime and not the testing by trap, trickiness or deceit of one suspected. The discovery of the crime and procurement of evidence by deception are not prohib-

---

[6] *Brady v. Maryland,* 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

ited. A trap may be set."

The objection made was that "Your Honor through this charge takes sides. You're telling the jury this is a case of undue persuasion as [the district attorney] told you. . . . I mean the court is no longer unbiased."

"It is a fundamental rule in Georgia that jury instructions must be read and considered as a whole in determining whether the charge contained error. [Cits.]" *Williams v. State*, 249 Ga. 822, 825 (3) (295 SE2d 293) (1982). So considering the charge, it fully and accurately informed the jury of the elements of the defense of entrapment.

Responding to an inquiry from the jury with an accurate legal statement, which the quoted language was, see *Thomas v. State*, 134 Ga. App. 18, 22 (2) (213 SE2d 129) (1975); *Sutton v. State*, 59 Ga. App. 198, 199 (200 SE 225) (1938), is not a violation of OCGA § 17-8-57. There was no error.

4. The remaining enumeration is without merit, no such motion for directed verdict having been made.

*Judgment affirmed. Pope, C. J., and Birdsong, P. J., concur.*

DECIDED NOVEMBER 1, 1993 —
RECONSIDERATION DENIED NOVEMBER 22, 1993 —

*Drew Findling*, for appellant.

*David McDade, District Attorney, William H. McClain, Assistant District Attorney*, for appellee.