### 60900. THE STATE v. MISURACA et al.

BIRDSONG, Judge.

Search and seizure. As relevant to this appeal by the state, the facts show that a Georgia State Patrolman, Griffin, was in the vicinity of Valdosta on routine patrol. He swore under oath both at a committal hearing and later at a suppression hearing that he monitored a radio broadcast from the local sheriff's headquarters in

the form of an alert to be on the lookout for a Winnebago recreational vehicle bearing a certain tag number which had failed to stop for Florida authorities and was a fugitive from the Florida authorities, a fairly frequent occurrence. Griffin did not hear or know of the basis for the concern of the Florida authorities. Griffin proceeded south on Interstate 75 toward the Florida line and soon observed a Winnebago proceeding north in the opposite line of traffic. Griffin turned through the median strip and fell in behind the Winnebago. He observed that the vehicle bore the tag described in the alert. Griffin also noted that the Winnebago was apparently heavily loaded and was very "low" on the rear axle. He noted that the vehicle swayed as if it was heavily loaded, and on one or more occasions strayed over the center line. Lastly, he noted that the curtains in the rear of the vehicle were of a heavy, opaque material, different than what he normally observed in vehicles in which people traveled and lived. Once having determined that the vehicle was the one he had been informed as having failed to stop for Florida authorities, Griffin radioed that he was behind the vehicle and was going to stop it. He turned on his blue light and the driver pulled over and stopped in the emergency lane. Not being able to see into the vehicle, and as a safety precaution, Griffin used his loud speaker and called for the driver to dismount and come to the rear of the Winnebago (where Griffin had stopped his vehicle) and bring his (the driver's) operator's license. At about this same time, another state patrolman pulled up close to Griffin's patrol car, dismounted and held a shotgun as cover for Griffin. The driver, appellee Eckert, did as instructed and came to the rear of the Winnebago. He presented his driver's license and a rental agreement to Griffin. Griffin entered his patrol car and checked the driver's license and vehicle through NCIC (National Crime Information Center) channels. Both the driver and the vehicle proved of negative value.

While Griffin was in the patrol car checking through NCIC channels, several other patrol cars arrived, one of which was occupied by one Rhymes, a drug enforcement officer with the Valdosta police. Rhymes had also heard the alert and was of the belief that the Winnebago was a suspected carrier of contraband. He testified that is the reason he appeared on the scene. When Rhymes arrived at the scene, he observed the appellee Eckert standing at the rear of the Winnebago along with a deputy sheriff named Norton. He saw another officer (Prine) standing further away holding a shotgun, apparently acting as cover. He saw Griffin talking on the car radio. Rhymes dismounted and approached the back end of the Winnebago. When he got close Rhymes smelled a faint odor of marijuana. He also noted the opaque curtains and that the Winnebago was low on the

rear axle. Rhymes, after smelling the marijuana, walked over to Griffin who was just concluding the NCIC check. Griffin handed Rhymes the driver's license and rental agreement. Griffin also informed Rhymes that he (Griffin), contrary to his first understanding, had learned over the radio that Florida had in fact successfully stopped Eckert in Florida but had released the Winnebago when Eckert insisted that his "wife and family" were asleep in the vehicle and the Florida agent could find no external evidence of contraband (the facts ultimately disclosed that the only passengers were Eckert and Misuraca). However, because of the suspicious circumstances, the Florida authorities suspected that the vehicle was being used to transport contraband.

Rhymes then approached Eckert for the first time. He informed Eckert he (Rhymes) could smell marijuana and requested permission to search the vehicle. Eckert refused. Rhymes then informed Eckert that Eckert would have to proceed to the local jail building where a search warrant would be obtained in order to search the vehicle. Eckert stated that he would inform his "family" of what was going to transpire. Rhymes agreed to allow Eckert to inform his "family" and Officers Norton and Rhymes accompanied Eckert to the entrance of the Winnebago. Eckert knocked on the door and called out his identification. When the door was opened, Eckert mounted two steps and entered the floor area of the Winnebago. Rhymes stepped up on the first step to keep Eckert in view for the protection of the two officers. As soon as the door opened, Rhymes detected a very strong odor of marijuana. Rhymes did not attempt to enter the vehicle to search it. Eckert then turned toward Rhymes and declined to go anywhere with the officers and particularly not to the jail building in order to procure a search warrant. Rhymes insisted that Eckert would have to go with the officers. When Eckert persisted in his refusal, Rhymes reached up and grasped Eckert by the arms. After a brief struggle, Eckert pulled away from Rhymes' grasp and pulled a gun from his waistband. Eckert pointed the gun at Rhymes and ordered Rhymes on into the vehicle. Only after he was in the vehicle and Eckert had driven away with his unwilling passenger did Rhymes first see the marijuana. This occurred when the appellee Misuraca set fire to the 1,563 pounds of marijuana aboard the Winnebago.

Appellees Eckert and Misuraca moved to suppress the results of the search and seizure, asserting that the stop by Griffin was improper as was the "search" by Rhymes. The trial court sustained the motion insofar as the evidence related to the 1,563 pounds of marijuana and the 2 1/2 pounds of cocaine found in the Winnebago. The state brings this appeal to the suppression of the evidence. *Held:*

As we view the evidence in the case, we are not dealing with the

routine situation involving a search and seizure. Rather, as we view the evidence, we here deal with a "Terry" style stop or temporary detention, followed by a continued detention with the view toward obtaining a search warrant based upon probable cause. In view of these conclusions, we find no prohibited search.

First we observe that the Fourteenth Amendment through the Fourth Amendment applies to state induced or supported actions. Its purpose is to curtail abusive state action. In the absence of unreasonable state action to invade the privacy of a citizen or seize his property without probable cause, there is no protection afforded as a fence against a Fourth Amendment violation. *State v. Young,* 234 Ga. 488, 489 (216 SE2d 586). Thus our initial inquiry must address the stop by Officer Griffin to determine if that stop was unreasonable. Immediately we conclude that Griffin never made any attempt unreasonably to invade the privacy claimed by Eckert or Misuraca. At most, Griffin made a temporary stop for the purpose of an investigatory inquiry. His basis for that stop was a radio report that the particular Winnebago had failed to stop for Florida authorities and was a fugitive from those authorities. His personal observation was that the vehicle fitted the profile of a transporter of contraband which apparently was fleeing from Florida authorities. It was heavily laden, swaying in the roadway, and had opaque curtains which he believed to be unusual and unlike curtains normally in such vehicles. Griffin stopped the vehicle for the purpose of making inquiries concerning the status of the vehicle and its occupants. The transcript shows that this is all Griffin did and this he did by making a NCIC check. At most this took only a few minutes.

Even though acts of peace officers in detaining and questioning a citizen are necessarily a curtailment of the citizen's right to go about his business unmolested (i. e., a seizure of the person); but more importantly because investigation and questioning are necessary elements of crime prevention and detection, the exigencies of the situation as they reasonably appear at the time to the officer involved must dictate the extent of intrusion into constitutionally protected areas. Beck v. Ohio, 379 U. S. 89, 96 (85 SC 223, 13 LE2d 142). Momentary detention and questioning are permissible if based upon specific and articulable facts, which, taken together with rational inferences from those facts, justify a reasonable scope of inquiry not based on mere inclination, caprice or harassment. An authorized officer may stop an automobile and conduct a limited investigative inquiry of its occupants, without probable cause, if he has reasonable grounds for such action—a founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing. *Brooks v. State,* 129 Ga. App. 109, 111

(198 SE2d 892).

The reverse of the above is that the Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest, to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. Adams v. Williams, 407 U. S. 143, 145 (92 SC 1921, 32 LE2d 612); *Stiggers v. State,* 151 Ga. App. 546, 547 (1) (260 SE2d 413). Under the facts known to Griffin and the physical observations available to him at the time of the stop, and considering his limited response and actions, we have no hesitance in concluding that the initial stop by Griffin was not an abuse of state action and not in violation of any rights protected by the Fourth Amendment. See *McKinney v. State,* 155 Ga. App. 930 (1980).

Having determined that the initial stop by Griffin was based upon reasonable and articulable facts that would have demanded any good policeman to temporarily detain such a vehicle, we proceed to an examination of the actions of Officer Rhymes. The simple answer is that Rhymes did no act that was in violation of any areas afforded constitutional protection against unlawful state invasion.

Rhymes testified that before he talked to Trooper Griffin (or anyone), and while Deputy Norton was standing with Eckert and Griffin was still on the radio he (Rhymes) walked to the rear end of the Winnebago and independently smelled a faint odor of marijuana. Even if we disregard the information transmitted to him by Griffin, the facts show Rhymes had already decided to conduct a search of the Winnebago because of the odor and the physical appearance of the Winnebago. However, the facts further show that Rhymes proceeded in a lawful fashion to arrange for such a search. Rhymes first sought the consent of the driver, Eckert, to search the vehicle, telling Eckert that he (Rhymes) had detected an odor of marijuana emanating from the vehicle and that the odor together with the curtains and the apparent heavy load led Rhymes to believe the vehicle contained marijuana. When Eckert refused permission to search the vehicle, Rhymes informed Eckert that he (Eckert) would have to go to the local jail where a search warrant could be obtained. In other words, the record is quite clear that Rhymes did not intend to search the vehicle absent consent or a search warrant. Eckert uttered words that indicated he understood the instructions and requested only the right to inform his "family" what was going to transpire. Even when Eckert entered the Winnebago to tell his "family" what was going to

happen, Rhymes testified without contradiction that he stepped up onto the first step only, not for the purpose of surveying the interior of the vehicle but for the protection of himself and Norton by keeping Eckert in view while Eckert informed his family and made preparations to drive to the jail building. Rhymes could at this time detect a strong odor of marijuana but still could see no contraband. The evidence firmly establishes that the only reason Rhymes fully entered the Winnebago was at the unlawful demand of Eckert at the point of a gun. Rhymes did not search the vehicle at any time. He was ordered at gunpoint to the front of the vehicle and occupied the passenger chair, still at point of a gun.

We have rather painstakingly outlined the circumstances involving Deputy Rhymes to substantiate our conclusion that Rhymes was never involved in a search. We conclude that in the circumstances of this case there was sufficient evidence to support a determination by Rhymes that reasonable cause existed to continue the detention so as to allow the conduct of a search of the vehicle either with the consent of the driver or after obtaining a valid warrant. *Cunningham v. State,* 131 Ga. App. 133, 135-136 (205 SE2d 899); and see *State v. Medders,* 153 Ga. App. 680, 681 (266 SE2d 331); *Yawn v. State,* 134 Ga. App. 77 (4) (213 SE2d 178). Nor does the fact that Rhymes informed Eckert a warrant was going to be obtained because Eckert had refused permission to search convert the detention to a search or infect the lawful detention with unlawful state action. See *Bailey v. State,* 147 Ga. App. 621, 622 (249 SE2d 675). There being reasonable cause to conduct a search, what followed (and resulted in the disclosure of the bales of marijuana and the packaged cocaine) was the product of the unlawful actions of Eckert and his passenger, Ms. Misuraca, and was not caused by any unlawful intrusion emanating from the exercise of a state power. Appellants have sought to convert a lawful and temporary detention into an unlawful search. Neither the facts nor the governing law support them in this extension. See *Thompson v. State,* 140 Ga. App. 293, 294 (231 SE2d 110); *State v. Smith,* 137 Ga. App. 101, 102 (223 SE2d 30). It follows that the trial court erred in partially granting appellees' motion to suppress so much of the discovered contents of the Winnebago as was based on the actions of the law enforcement officers up until the time of Eckert's gunpoint order to Rhymes to "Come on in!"

Parenthetically this court has been informed that during the pendency of this appeal, the appellant Eckert died while in another state. Accordingly as to the appellant Eckert, the appeal is dismissed. *Harris v. State,* 229 Ga. 691 (194 SE2d 76); *Hicks v. State,* 228 Ga. 538 (186 SE2d 740); *Taylor v. State,* 137 Ga. 86 (72 SE 898). The

discussion herein of the several issues is fully applicable however to the appeal of Ms. Misuraca.

*Judgment reversed. Deen, P. J., and Sognier, J., concur.*

DECIDED JANUARY 16, 1981 —
REHEARING DENIED FEBRUARY 5, 1981 —

*Richard W. Shelton, Assistant District Attorney,* for appellant.
*J. Converse Bright, Marcus Sanders Topel, Martin G. Weinberg,* for appellees.