## A04A2290. WRIGHT v. THE STATE.
### (612 SE2d 576)

BARNES, Judge.

Following a bench trial, Tracy Wright appeals her convictions for trafficking in methamphetamine, marijuana possession with intent to distribute, firearms possession during the commission of a crime, carrying a concealed weapon, and possession of drug-related objects. She contends that the trial court erred in denying her motion to suppress, arguing that no probable cause existed to justify the traffic stop that led to the search and seizure of the drugs. For the reasons that follow, we affirm the trial court.

On appeal, Wright contends the trial court erred by denying the motion to suppress because the deputies lacked a reasonable articulable suspicion to stop her, and only cited the offense of changing lanes without a signal as a pretext. She also contends that the sole reason the police stopped her was because of the alleged traffic

violation, and that the officer improperly expanded the scope of the stop after determining she was not impaired.

1. When we review

> a trial court's decision on a motion to suppress, this court's responsibility is to ensure that there was a substantial basis for the decision. The evidence is construed most favorably to uphold the findings and judgment, and the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous. Further, since the trial court sits as the trier of fact, its findings are analogous to a jury verdict and will not be disturbed if there is any evidence to support them.

(Citations omitted.) *Morgan v. State*, 195 Ga. App. 732, 735 (3) (394 SE2d 639) (1990). When the evidence is uncontroverted and no question of witness credibility is presented, "the trial court's application of the law to undisputed facts is subject to de novo appellate review. [Cits.]" *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994). To the extent this issue concerns mixed questions of fact and law, we will accept the trial court's findings on disputed facts and witness credibility unless they are clearly erroneous, but independently apply the law to the facts. *Morrow v. State*, 272 Ga. 691, 693 (1) (532 SE2d 78) (2000).

So viewed, the evidence shows that on September 25, 2002, at around 8:30 p.m., a police lieutenant received a telephone call from Steve Wright, the uncle of a man who had done some construction work on the lieutenant's house. Steve Wright had also worked with the officer's nephew and brother. Steve Wright, who said his nephew had suggested he call the lieutenant for help, explained that he and his ex-wife were having a custody dispute over their teenaged sons, that she was using and selling drugs, and that he did not want his kids to be around it. He gave the officer his ex-wife's name, Tracy Wright, described the make, model, year, and color of her truck, and said that she was coming to Douglasville from Carroll County in the next thirty minutes on one of two specific roads. She was going to meet him at an International House of Pancakes ("IHOP"), and would have three ounces of methamphetamine with her along with a loaded gun. He knew the amount because he had called and told her how much he wanted to buy.

The lieutenant relayed this information to a patrol officer and the narcotics division within ten minutes, and updated the narcotics detective when Steve Wright called a second time to say that Tracy Wright was at a supermarket on Highway 5. The detective testified that he met with the lieutenant at the police station to hear details of

the tip Steve Wright had supplied. He and his partner then set up at the IHOP in separate, unmarked cars to wait and see if Tracy Wright arrived. While there, the lieutenant called to say that he had received information that Tracy Wright was at the supermarket a short distance away, so the detective went to the supermarket's parking lot and located a truck that matched the description Steve Wright had given. He ran the tag and confirmed that the truck belonged to Tracy Wright, then waited for her to return to the vehicle with a bag of groceries. At that time, he had corroborated the information relayed by the tipster through the lieutenant about the time, area, vehicle, and driver with his own observations.

The detective contacted his partner and followed about 100 yards behind Wright as she left the parking lot onto Highway 5. He noted that Wright began traveling in the right lane, then moved to the left lane without signaling, then moved again into the turn lane without signaling and turned through a yellow light onto another road. It was dark and raining, and he had trouble keeping up with her because she was traveling around 50 mph. Traffic was light around the supermarket, but became heavier on Highway 5, where many local businesses were still open and cars were exiting and entering the highway. The detective was unable to follow her through the light, which had turned red, so he radioed a patrol officer waiting ahead and told him to stop Wright based on the lane change violations.

The patrol officer testified that the undercover detective was his superior, and that the detective told him to stage at a nearby business when they first received the tip, and wait for further instructions. The detective then radioed him that he had located Wright, that she had changed lanes and was driving too fast for conditions, and that the officer should make a traffic stop. The patrol officer activated his emergency equipment as Wright turned into the IHOP parking lot and approached the driver's side of the truck to talk to her. He testified that he had smelled both burned and unburned marijuana numerous times in the course of his police work, and that the smells were very different, much as the smell of cigar smoke differed from the smell of an unlit cigar. As the officer stepped up to the truck, he smelled the odor of raw marijuana from the open window when he was a foot or two away. He asked Wright for her driver's license and proof of insurance, and noticed that she was shaking all over and very nervous. He asked her to perform field sobriety tests because "usually people that are around marijuana smoke it," but he did not see enough evidence to support a DUI charge.

The officer then asked Wright if she had any weapons in the vehicle, a question he asked often if he thought narcotics might be present because "a lot of people that deal drugs or use drugs carry weapons in their vehicle." Wright said she did, in a bag on the front

floorboard, and admitted she did not have a permit to carry a concealed weapon. When the officer said he would retrieve it in a minute, Wright became "very, very nervous," and said twice that she could get it for him, both times walking toward the truck. When she started for the truck the second time, the officer went ahead and got the gun, because as he explained, he did not want her to retrieve the gun and shoot him.

When the officer opened a tote bag on the floorboard to retrieve the weapon, he saw a large quantity of what appeared to be packaged methamphetamine next to the handgun. He secured the weapon, exited the truck and arrested Wright for possession of a concealed weapon and methamphetamine. The two detectives and another patrol officer were present and searched the truck, and the arresting officer turned over the scene to them. Along with the methamphetamine, the detective found fourteen pounds of marijuana in a plastic garbage bag behind the driver's seat, packaged in separate one-pound plastic freezer bags.

A forensic chemist with the Georgia Bureau of Investigation crime lab tested 75.6 grams of the powdery substance found in Wright's car, which tested positive for methamphetamine. Another forensic chemist testified that the green leafy substance found in Wright's car tested positive for marijuana, and weighed less than 50 pounds (the amount required to prove trafficking) but more than 28.35 grams, the amount to prove possession with intent to distribute.

2. An officer may stop a person to conduct a brief investigation if specific, articulable facts give rise to a reasonable suspicion of criminal conduct. *Terry v. Ohio*, 392 U. S. 1, 27 (88 SC 1868, 20 LE2d 889) (1968). "And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Id. Wright argues that the trial court erred in denying her motion to suppress because the traffic stop based on her failure to use a turn signal was pretextual. She cites *Clark v. State*, 208 Ga. App. 896 (432 SE2d 220) (1993), for the proposition that, absent evidence that other motorists were endangered, a traffic stop based only on failure to use a turn signal is pretextual.

We note first that the opinion in *Clark* is physical precedent only.[1] Further, in *Whren v. United States*, 517 U. S. 806 (116 SC 1769,

---

[1] "A judgment which is fully concurred in by all judges of the Division is a binding precedent; if there is a special concurrence without a statement of agreement with all that is said in the opinion or a concurrence in the judgment only, the opinion is a physical precedent

135 LE2d 89) (1996), the United States Supreme Court held that the temporary detention of a motorist upon probable cause to believe that he has violated the traffic laws does not violate the Fourth Amendment's prohibition against unreasonable seizures, even if a reasonable officer would not have stopped the vehicle absent some additional law enforcement objective. "In other words, if the arresting officer witnessed the driver breaking even a relatively minor traffic law, a motion to suppress under the Fourth Amendment arguing that the stop was pretextual must fail." *State v. Reddy*, 236 Ga. App. 106, 108 (1) (b) (511 SE2d 530) (1999).

Additionally, in this case the traffic violation was not the only reason Wright was stopped. While the patrol officer stopped Wright for a lane change violation upon instructions from the undercover narcotics detective who was his superior officer, numerous other factors were considered before concluding that specific and articulable facts existed to warrant a brief investigative stop of the truck. Those factors included personal corroboration of information from a known tipster.

> Although a tip provided by an informant of unknown reliability will not ordinarily create a reasonable suspicion of criminal activity, if the tip is detailed enough to provide some basis for predicting the future behavior of the suspect, reliability may be established if the details are corroborated by the observations of the police. *Easterlin v. State*, 216 Ga. App. 112, 113 (452 SE2d 801) [(1995)].

(Punctuation omitted.) *Buffington v. State*, 228 Ga. App. 810, 812 (492 SE2d 762) (1997). The lieutenant who received the initial tip knew the identity of the tipster through family connections. Because the tip was from a known albeit untested person and not an anonymous tipster, it had more indicia of reliability than an anonymous tip. *Burse v. State*, 209 Ga. App. 276, 278 (433 SE2d 386) (1993). Further, " 'the anonymous tip contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.' [*Illinois v.*] *Gates*, 462 U. S. [213,] 245 [(103 SC 2317, 76 LE2d 527) (1983)]." *Alabama v. White*, 496 U. S. 325, 332 (110 SC 2412, 110 LE2d 301) (1990).

> Momentary detention and questioning are permissible if based upon specific and articulable facts, which, taken together with rational inferences from those facts, justify a

only." Court of Appeals Rule 33 (2004).

reasonable scope of inquiry not based on mere inclination, caprice or harassment. An authorized officer may stop an automobile and conduct a limited investigative inquiry of its occupants, without probable cause, if he has reasonable grounds for such action — a founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing. [Cit.]

*State v. Misuraca*, 157 Ga. App. 361, 364-365 (276 SE2d 679) (1981).

The detective who issued the order to stop Wright corroborated the vehicle's make, model, year, color, route, location, and occupant, and those facts, along with the traffic violation, constituted a reasonable, articulable suspicion that justified stopping and questioning Wright. *Bentley v. State*, 214 Ga. App. 580, 582 (2) (448 SE2d 479) (1994).

3. Once the patrol officer stopped Wright for the traffic violations, considering the raw marijuana smell, Wright's appearance, nervousness, and the two times she attempted to rush to her gun, these factors justified Wright's continued detention. *Taylor v. State*, 230 Ga. App. 749, 751 (1) (c) (498 SE2d 113) (1998).[2] Further, the officer was justified in retrieving the weapon from Wright's car, considering that she admitted it was concealed, did not have a permit for it, and had twice started toward the car to get it herself. See *Ross v. State*, 255 Ga. App. 462 (566 SE2d 47) (2002).

During the officer's brief intrusion necessary to secure the weapon in Wright's car, he opened the bag Wright said contained the handgun and saw the methamphetamine package actually touching the gun.

The plain view doctrine authorizes a police officer to seize an illegal item if the officer is lawfully in a place where he can see the item and if he has a lawful right of access to it. An officer gains lawful access to an item in plain view by obtaining a search warrant, obtaining consent to search, or the existence of exigent circumstances.

(Footnotes omitted.) *Benton v. State*, 240 Ga. App. 243, 244 (1) (522 SE2d 726) (1999). In this case, the trial court did not err in concluding that exigent circumstances existed to give the officer lawful access to Wright's bag, which contained both the gun and the methamphetamine. The drugs and illegal weapon in turn gave the officer probable cause to arrest Wright, and the resulting search of her vehicle that

[2] But see *King v. State*, 267 Ga. App. 546, 548-549 (600 SE2d 647) (2004) (Barnes, J., concurring specially).

yielded additional methamphetamine and a large quantity of marijuana was thus justified as incident to her arrest.

4. Wright contends that insufficient evidence supported her conviction for carrying a concealed weapon, because OCGA § 16-11-126 (d) provides that a person may transport a firearm if it is "enclosed in a case, unloaded, and separated from its ammunition." While some contradiction existed among the State's witnesses regarding who determined the handgun was loaded, the trial court specifically addressed this issue. The court said it had considered the conflicting evidence and found more credible the detective's testimony that the gun was loaded when taken from Wright's truck.

> In a bench trial, the judge sits as the trier of fact who determines the credibility of the witnesses and who may accept or reject any part of a witness' testimony, even in the absence of contradictory testimony. . . . Furthermore, because the court in this case sat as the factfinder, we will not set aside its factual findings unless they are clearly erroneous. A trial court's factual findings are not clearly erroneous if there is any evidence to support them.

(Citations omitted.) *Bettis v. State*, 228 Ga. App. 120, 121 (491 SE2d 155) (1997). As some evidence supports the trial court's factual finding here, the evidence that Wright carried a concealed weapon was sufficient.

*Judgment affirmed. Blackburn, P. J., and Mikell, J., concur.*

DECIDED MARCH 23, 2005.

*Morriss, Lober & Dobson, Bruce F. Morriss, Daniel Shim*, for appellant.

*David McDade, District Attorney, Pamela D. Brophy, Christopher R. Johnson, Assistant District Attorneys*, for appellee.