[Cite as *State v. Polk*, 2016-Ohio-28.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 14AP-787 |
| v. | : | (C.P.C. No. 13CR-2787) |
| Joshua Polk, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on January 7, 2016

*Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellant.

*Yeura R. Venters*, Public Defender, and *Timothy E. Pierce*, for appellee.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Plaintiff-appellant, State of Ohio, appeals from a decision of the Franklin County Court of Common Pleas, rendered on September 29, 2014, which suppressed the evidence against defendant-appellee, Joshua Polk. We find that the trial court acted within its fact-finding discretion when it concluded that Polk's unattended bag was searched solely based on rumors that Polk was affiliated with a gang. Because that is a constitutionally insufficient basis for a search (even within a school where expectations of privacy are lessened) and because subsequent searches grew from the poisonous fruit of that search, we overrule the state's assignment of error and affirm the decision of the trial court.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On May 22, 2013, an indictment issued for Polk. The indictment alleged that, on February 5, 2013, Polk had possessed a gun in a school. Polk filed a motion to

suppress the gun on June 5, 2014.  The state responded.  On September 17, 2014, the trial court held an evidentiary hearing on the motion to suppress.

{¶ 3}  A single witness testified at the hearing, a school security officer by the name of Robert Lindsey.  Lindsey explained that he is not a police officer but that he is a safety and security officer employed by Columbus Public Schools and works at Whetstone High School.  On February 5, 2013, when Lindsey was on duty, a school bus driver approached him with a book bag that had been left on a bus, seeking to have it returned to its owner.  Lindsey testified that he opened the bag and was able to quickly determine that it belonged to Polk.[1]  However, he began to search further and dumped out the bag, "just to, you know, be precautious, [sic] that's what we do."[2]  (Tr. 6.)  Lindsey said that when he saw Polk's name, he remembered rumors that Polk was in a gang and he admitted he was thinking about that when he dumped out the bag.  However, he also testified that he would have dumped out the bag and searched it, regardless of to whom it belonged, because even though there was nothing outwardly suspicious about the bag, it was unattended.

{¶ 4}  When Lindsey dumped out the book bag he found along with binders, books, and other school appropriate materials, several small caliber bullets.  Lindsey notified the principal of what he found, and the principal in turn notified a Columbus Police Department ("CPD") officer.  The record is not clear about how soon after Lindsey found the bullets the next part of the investigation occurred.  Lindsey testified that he thought (though he was not absolutely certain) that it was within 15 or 20 minutes that the principal, the CPD officer, and Lindsey acted together to find Polk.

{¶ 5}  The three men encountered Polk in a hallway full of other students.  Because of the number of other students present, the three directed Polk to an empty classroom.  The CPD officer told Polk he was going to place him in a hold, asked him not to resist, and then restrained Polk.  With Polk restrained, the CPD officer directed Lindsey to search the bag Polk had been carrying when the trio encountered him.  Lindsey did and found a pistol in the bag.

---

[1] Lindsey also testified that the book bag had Polk's name on it, but later clarified that Polk's name was not actually imprinted on the exterior of the bag.

[2] Later in the hearing Lindsey also suggested that the principal was present and possibly helping when he dumped out the bag and searched it.

{¶ 6}   On September 29, 2014, the trial court issued a written decision in which it granted Polk's motion to suppress.  The trial court found that Lindsey's initial inspection of the bag, by which he determined that Polk was the owner, was justified.  However the trial court concluded that Lindsey's further search of the bag (conducted by dumping it out) was based on the rumors that "came into [Lindsey's] head" that Polk had ties to a gang, and that was an insufficient basis for the search.   (Decision and Entry, 2.) Accordingly, the trial court suppressed bullets recovered in that search and the gun recovered in the subsequent search.

{¶ 7}   The state now appeals pursuant to Crim.R. 12(K) and App.R. 4(B)(4).

## II.  ASSIGNMENT OF ERROR

{¶ 8}   The state advances a single assignment of error:

> The Trial Court Committed Reversible Error in Sustaining Polk's Motion to Suppress.

## III.  DISCUSSION

{¶ 9}   "However one may characterize their privacy expectations, students properly are afforded some constitutional protections." *N.J. v. T.L.O.*, 469 U.S. 325, 348 (1985) (Powell, J., concurring).  "[S]tudents do not 'shed their constitutional rights . . . at the schoolhouse gate.' "  *Id.*, quoting *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 506 (1969). The school's need to maintain discipline and ensure the safety of its students, however, results in a lesser expectation of privacy for students than a person outside of school would enjoy.  *Id.* at 337-40.  Yet schools are not prisons and though a prisoner has no expectation of privacy, students do.  *Id.* at 338, quoting *Ingraham v. Wright*, 430 U.S. 651, 669 (1977) (" '[the] prisoner and the schoolchild stand in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration' ").

{¶ 10}   In *T.L.O.* the United States Supreme Court struck a middle course between recognizing the full panoply of Fourth Amendment rights for students and affording them no privacy rights like prisoners.  It found the warrant requirement to be inapplicable to schools and further said that probable cause was not necessary to justify a search in a school.  *Id.* at 340-41.  Then it explained what justification is needed to search students:

> [T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether

> the * * * action was justified at its inception," *Terry v. Ohio*, 392 U.S. [1,] 20 [(1967)]; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place," *ibid.* Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

(Footnotes omitted.) *Id.* at 341-42.

{¶ 11} We afford deference to the trial court's factual determinations and review its recitation of historical facts with deference but we review statements of law and the application of law to facts de novo. *See, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, ¶ 50.

### A. Whether the Searches of Polk's Bags were Constitutional

{¶ 12} The first search of Polk's property occurred when Lindsey examined the bag found on the bus and made a cursory inspection of its contents for safety purposes as an unattended bag, examined to determine if it posed a danger, such as containing a dangerous device, and for determining to whom the bag belonged. We find that this first search was reasonable and justifiable.

{¶ 13} Polk had a "legitimate expectation of privacy" in his personal effects, including his book bag. *T.L.O.* at 337-39. A legitimate expectation of privacy is composed of "two elements: (1) whether an individual's conduct has exhibited such an expectation, and (2) whether the individual's subjective expectation of privacy is one that society is prepared to accept as reasonable under the circumstances." *United States v. Dillard*, 78 F.Appx. 505, 509 (6th Cir.2003); *see also Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Rakas v. Illinois*, 439 U.S. 128, 143 (1978), fn. 12; *United States v. Tolbert*, 692 F.2d 1041, 1044 (6th Cir.1982). In view of these two components, Polk's expectation of privacy in his bag was diminished both by the fact that he was on school property with differing norms and rules on search and seizure, and that he left the book bag on the bus, exposing it to search to determine ownership and ensure that it was not an intentionally planted

dangerous package.  *See, e.g., United States v. Wilson*, 984 F.Supp.2d 676, 683 (E.D.Ky. 2013) (explaining that law enforcement may look through lost and found containers to determine the owner and the owner's contact information as well as to protect the temporary custodian of the lost container from danger); *but cf. Tangredi v. New York City Dept. of Environmental Protection*, S.D.N.Y. No. 09 cv 7477 (VB) (Feb. 16, 2012) (finding the search of bag left unattended in a women's locker room to be unreasonable and not justified by safety motivations).  Thus the need to determine ownership of the bag and to determine that it did not pose a hazard justified the limited intrusion of opening the bag and making a cursory examination of its contents.

{¶ 14} The justification for an intrusion or search expires when it is fulfilled, making further unjustified searches unlawful.  *See, e.g., Arizona v. Hicks*, 480 U.S. 321, 323-25 (1987) (holding that a search for shooting victims or weapons following a shooting in an apartment building did not extend, without additional justification, to moving stereo equipment in order to record the serial numbers to determine if it was stolen).  In Polk's case no contraband was found during the initial search. Lindsey successfully determined both that the bag was not a bomb and that it was owned by Polk (a student at the school) during the initial search.  After the initial search, all justifications for examining the bag's contents were fulfilled and no further justification existed to search the bag.

{¶ 15} Nonetheless a second search occurred when Lindsey took the bag to the principal, emptied it, and made a more detailed inspection of its contents.  Lindsey testified he had two further justifications for the more detailed search. Lindsey testified that rumors that Polk was in a gang came into his head once he identified the bag as Polk's.  He also testified that he thoroughly searches every unattended bag in the school for safety reasons and that rumors about Polk's affiliations did not affect his decision to empty the bag and thoroughly examine its contents because he would have done that no matter whose bag it was.  This testimony could be interpreted either as conflicting or as different stages of an officer's "thought process," and interpreting it would be subject to the discretion of the judge hearing the testimony on a motion to suppress.  The trial court found as a factual matter that the second search was motivated "solely" by rumors that Polk had ties to a gang.  The trial court did not abuse its discretion in making this finding. *See, e.g., Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, ¶ 37 (affording the factual findings of the trial court "great deference"); *Testa v. Roberts*, 44

Ohio App.3d 161, 165 (6th Dist.1988) (affording a trial court's judgments on credibility "the utmost deference").

{¶ 16} We agree with the trial court that the second search could have been justified at the outset, "[i]f Officer Lindsay [sic] had dumped the entire contents of the bag in his initial search for safety purposes and/or to obtain the owners [sic] identity." (Decision and Entry, 4.) That is, in a school setting, emptying the entire bag would have been an acceptable way to meet the two initial justifications for the search: safety and identification. But Lindsey did not empty the bag at first. He testified he took the bag to the principal's office, recalling that rumors existed that Polk was involved in gang activity, and *then* emptied the contents of the bag. It was not an abuse of discretion for the trial court to conclude that Lindsey's testimony that he always intended to empty the bag was not credible. Only after he found out that the bag belonged to Polk and remembered rumors that Polk was affiliated with a gang did he empty the bag and perform a detailed inspection of its contents. The trial court was well within its fact-finding discretion to conclude, based on the circumstances, the testimony and its ability to evaluate the officer's credibility, that the second search was based "solely" on rumors of Polk's gang affiliation.

{¶ 17} Rumors do not rise to reasonable suspicion, and mere affiliation with a criminal group does not constitute a crime or a justification for a search, even in a school. *G.M. v. State*, 142 So.3d 823 (Ala.2013) (mere association with a gang does not justify a search in a school); *see also Elfbrandt v. Russell*, 384 U.S. 11, 14-16 (1966) (holding that mere membership in a group with illegal purposes cannot be criminalized, as that would violate the First Amendment); *cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 29 (2010) (finding valid Congress' criminalization of providing "material support or resources" for terrorism on the basis that Congress specifically found that "organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct"). (Emphasis omitted.)

{¶ 18} The second search was not "justified at its inception." *T.L.O.* at 341, quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968). The trial court did not abuse its discretion in determining that Lindsey conducted the second and more detailed search of the bag based solely on rumors that Polk was affiliated with a gang. Because that is a legally insufficient

basis for a search (even in a school), we agree that the second search of Polk's bag violated the Fourth Amendment.

{¶ 19} The bullets were discovered in the unconstitutional second search of Polk's bag, and the bullets were the basis for suspecting that Polk might have a gun and detaining Polk and conducting a third search. While we have great concerns about the fact that a gun was found with Polk when a third search was conducted on school premises, we cannot sacrifice the constitutional guarantee against unwarranted searches and seizures, just because of the circumstances, when the fruits of the third search emanated from a "poisonous tree." The gun was acquired by "exploitation" of the original search or, as the United States Supreme Court put it, the "primary illegality." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). The fruits of the search of Polk's person and second bag were properly suppressed in Polk's criminal case. *Id.*

### B. Whether the Exclusionary Rule Applies to Searches Conducted by Public School Employees

{¶ 20} The state argues that the exclusionary rule is intended to deter police officer misconduct and thus should not apply to the school setting or school officials. However, this argument has not been accepted by the United States Supreme Court. "The State of New Jersey sought review in [the Supreme] Court, first arguing that the exclusionary rule is wholly inapplicable to searches conducted by school officials, and then contending that the Fourth Amendment itself provides no protection at all to the student's privacy. The Court has accepted neither of these frontal assaults on the Fourth Amendment." *T.L.O.* at 371 (Stevens, J., concurring in part and dissenting in part). As the court in *T.L.O.* put it:

> [T]he State of New Jersey has argued that the history of the Fourth Amendment indicates that the Amendment was intended to regulate only searches and seizures carried out by law enforcement officers; accordingly, although public school officials are concededly state agents for purposes of the Fourteenth Amendment, the Fourth Amendment creates no rights enforceable against them.
>
> It may well be true that the evil toward which the Fourth Amendment was primarily directed was the resurrection of the pre-Revolutionary practice of using general warrants or "writs of assistance" to authorize searches for contraband by officers of the Crown. *See United States v. Chadwick*, 433 U.S. 1, 7-8 (1977); *Boyd v. United States*, 116 U.S. 616, 624-629 (1886). But this Court has never limited the Amendment's prohibition on unreasonable searches and

seizures to operations conducted by the police. Rather, the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon "governmental action" -- that is, "upon the activities of sovereign authority." *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities: building inspectors, *see Camara v. Municipal Court*, 387 U.S. 523, 528 (1967), Occupational Safety and Health Act inspectors, *see Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312-313 (1978), and even firemen entering privately owned premises to battle a fire, *see Michigan v. Tyler*, 436 U.S. 499, 506 (1978), are all subject to the restraints imposed by the Fourth Amendment. As we observed in *Camara v. Municipal Court, supra*, "[the] basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." 387 U.S., at 528. Because the individual's interest in privacy and personal security "suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards," *Marshall v. Barlow's, Inc., supra*, at 312-313, it would be "anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara v. Municipal Court, supra*, at 530.

*Id.* at 334-35. In short, public school employees are state actors for purposes of the Fourth Amendment, and evidence collected by teachers when they (or a school safety officer) investigate a student to determine whether the student has committed a criminal act may be subject to the exclusionary rule if a subsequent criminal prosecution occurs.

{¶ 21} To hold otherwise would be to revive what was known as the silver platter doctrine for use against Ohio's school children. This doctrine allowed law enforcement agents from jurisdictions outside the reach of the Fourth Amendment to develop evidence through means that would otherwise have been unconstitutional and then deliver that evidence on a "silver platter" to law enforcement officers who were subject to the Fourth Amendment's strictures in order to avoid the operation of the exclusionary rule. *Elkins v. United States*, 364 U.S. 206, 208 (1960), fn. 2 (prohibiting the practice of the silver platter doctrine). Public school employees are state actors for the purposes of the Fourth Amendment when they discover evidence and deliver it to the police or prosecutorial authorities so that their students may be prosecuted. *T.L.O.* at 334-35. If the evidence

they collect in violation of the Fourth Amendment were able to be used when turned over to law enforcement, school employees would have little incentive to respect student's rights, and worse, law enforcement would have an incentive to use school employees as Fourth Amendment immune agents to conduct illegal student searches in schools. The United States Supreme Court explained in *Elkins* that the silver platter doctrine arose out of close cooperation between state officers (who were not then subject to the Fourth Amendment) and federal officers (who were) which led to the realization that evidence collected by the state officers in violation of the Constitution could be delivered on a "silver platter" to the federal officers for use in federal cases. *Id.* at 211-13. As more and more schools (like Whetstone) enjoy the security of on-site police officers, it is not hard to envision the potential for evidence collected by school personnel to be taken by police free of the threat of exclusion in order to convict students. We understand that contemporary educational environments have been drastically affected by the proliferation of school shootings. Yet, we cannot, even under those circumstances, revive a long defunct and thoroughly denounced practice that violates the Constitution, so as to fashion a remedy that fails Constitutional sanction. If a school employee violates the Fourth Amendment to obtain evidence against a student, that evidence may not be used in a subsequent criminal trial.[3]

{¶ 22} Recognizing the relatively low standard of reasonableness set by *T.L.O.* in school settings, the fact that not all crimes committed in schools are reported to law enforcement, and the high likelihood that criminal cases involving students involve juveniles, there are few published decisions about violations of the Fourth Amendment in a public school context, and especially, cases concerning evidence collected in schools. However, when a violation is found, most cases result in a court invoking the exclusionary rule to appropriately enforce constitutional principles. *See G.M.* at 829; *State v. Jones*, 666 N.W.2d 142, 146 (Iowa 2003); *D.I.R. v. State*, 683 N.E.2d 251, 253 (Ind.App.1997); *In re William G.*, 709 P.2d 1287, 1298 (Cal.1985), fn. 17; *In re: T.L.O.*, 463 A.2d 934, 943-44 (N.J.1983) *rev'd on grounds that search was reasonable* 469 U.S. 325 (1985); *State v. Mora*, 307 So.2d 317, 320 (La.1975); *People v. Scott D.*, 315 N.E.2d 466, 471

---

[3] We do not address the question of whether the evidence obtained by a teacher in violation of the Fourth Amendment could be used for purposes other than criminal prosecution (like school discipline). *See, e.g.*, *Immigration & Naturalization Servs. v. Lopez-Mendoza*, 468 U.S. 1032, 1041-43 (1984) (the exclusionary rule is not applicable to civil proceedings).

(N.Y.App.1974); *see also In Interest of L.*, 90 Wis.2d 585, 591-93 (1979) (finding exclusionary rule applies in schools but not finding that the particular search at issue was unreasonable).

{¶ 23} In support of the contrary notion that the exclusionary rule does not apply in schools, the state draws our attention to *State v. Young*, 216 S.E.2d 586 (Ga.1975). In *Young*, the Georgia Supreme Court declined to apply the exclusionary rule in a school search case because it believed the United States Supreme Court had not sanctioned the use of the exclusionary rule in any context other than law enforcement officer actions. *Id.* at 589-94. However *Young* pre-dated the United States Supreme Court's decision in *T.L.O.* and has been persuasively criticized since:

> In *State v. Young*, 234 Ga. 488, 216 S.E.2d 586 (1975), the Georgia Supreme Court classified searches into three categories for purposes of the fourth amendment: (1) wholly private searches to which the amendment does not apply, (2) state action not involving law enforcement agents protected by the amendment but not the exclusionary rule, and (3) searches by law enforcement agents to which both the amendment and the exclusionary rule apply. Searches by teachers would fall within the second category and so would not be subject to the exclusionary rule. *This classification does not adequately account, however, for evidence seized by a teacher and turned over to law enforcement agents.* Once the evidence comes into the possession of law enforcement officers and is used in court proceedings against the liberty interests of the person searched, *the exclusionary rule must be available to deter prosecutions based on unlawful searches.* Without such exclusions, school personnel and other government employees would become the same sort of bypass around the amendment's protections that the Court meant to close by extending the exclusionary rule to state court proceedings in *Mapp v. Ohio* [367 U.S. 643, 654 (1961)].

(Emphasis added.) *In Interest of L.* at 592, fn. 1.

{¶ 24} The state also argues that civil remedies under, for example, 42 U.S.C. 1983, are a sufficient means to enforce the Fourth Amendment's guarantees and that we should therefore discard the exclusionary rule because it entails the high cost of letting criminals go free when the "constable blunders." But most such potential civil rights violators already enjoy immunity. *See, e.g., Connick v. Thompson*, 563 U.S. 51 (2011) (prosecutorial immunity); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity

for government agents and police); *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967) (judicial immunity). Moreover, *statutory* governmental immunity insulates actors in many cases, including in Ohio schools. *See* R.C. 2744.03.

{¶ 25} There is no expectation of privacy in criminal material, and thus, a suspect is not damaged by its discovery. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005); *Rakas* at 143, fn. 12. However, when *nothing* is found, nothing is seized, and no loss inures to the victim, except perhaps the temporary embarrassment associated with the search itself. In response to the state's 42 U.S.C. 1983 scenario, such resulting nominal damages for a search bearing no fruits will rarely justify the time and trouble of a federal lawsuit. Therefore, without exclusion, there remains little to deter future activity that violates the Fourth Amendment violations. As Justice Jackson observed:

> Only occasional and more flagrant abuses [of the Fourth Amendment] come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.
>
> Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty.

*Brinegar v. United States*, 338 U.S. 160, 181 (1949) (Jackson, J., dissenting). History has shown that civil damages are not an adequate remedy for Fourth Amendment violations, a fact recognized by the United States Supreme Court.

> The experience in California has been most illuminating. In 1955 the Supreme Court of that State resolutely turned its back on many years of precedent and adopted the exclusionary rule. *People v. Cahan*, 44 Cal.2d 434, 282 P.2d 905. "We have been compelled to reach that conclusion because other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to participate in, and in effect condone, the lawless activities of law enforcement officers. * * * Experience has demonstrated,

> however, that neither administrative, criminal nor civil remedies are effective in suppressing lawless searches and seizures. The innocent suffer with the guilty, and we cannot close our eyes to the effect the rule we adopt will have on the rights of those not before the court." 44 Cal.2d 434, at 445, 447, 282 P.2d 905, at 911-912, 913.

*Elkins* at 220.

{¶ 26} The Fourth Amendment exists to be enforced, which means providing a remedy.  As civil liability (in light of wide-ranging immunity and lack of practical damages) has not proven effective, exclusion, despite its costs, is the available remedy. Without the remedy of exclusion, no practical remedy would exist for Fourth Amendment violations, and "the protection of the Fourth Amendment declaring [one's] right to be secure against such searches and seizures [would be] of no value, and * * * might as well be stricken from the Constitution." *Weeks v. United States*, 232 U.S. 383, 393 (1914).

### C.  Whether a "Good-Faith" Exception to the Exclusionary Rule Applies

{¶ 27} Courts have recognized a good-faith exception to the exclusionary rule when a law enforcement officer relies on an established legal principle that later changes or upon the judgment of a judicial officer removed from the "often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948); *see, e.g., United States v. Leon*, 468 U.S. 897 (1984) (exception applied for good-faith reliance upon a warrant later determined to be invalid); *Illinois v. Krull*, 480 U.S. 340 (1987) (exception applied for good-faith reliance upon a statute later found to be unconstitutional); *Arizona v. Evans*, 514 U.S. 1 (1995) (exception applied for good-faith reliance upon a database that falsely indicated police had a warrant); *Herring v. United States*, 555 U.S. 135 (2009) (same); *Davis v. United States*, 131 S.Ct. 2419 (2011) (exception applied for good-faith reliance upon a "bright-line rule" of appellate decision that authorized the search and then later changed to prohibit it); *see also State v. Johnson*, 141 Ohio St.3d 136, 2014-Ohio-5021 (where past United States Supreme Court rulings authorized tracking an automobile in public and then a new United States Supreme Court case held that placement of a GPS device for the purpose of tracking an automobile in public was nonetheless a search for purposes of the Fourth Amendment); *State v. Brown*, 142 Ohio St.3d 92, 2015-Ohio-486, (where a probate judge improperly issued a warrant).

{¶ 28} However, "Ohio courts, including this court, have declined to apply the *Leon* good-faith exception in cases in which officers, conducting warrantless searches, relied on

their own belief that they were acting in a reasonable manner." *State v. Thomas*, 10th Dist. No. 14AP-185, 2015-Ohio-1778, ¶ 46, citing *State v. Forrest*, 10th Dist. No. 11AP-291, 2011-Ohio-6234, ¶ 17-18; *State v. Simon*, 119 Ohio App.3d 484, 488-89 (9th Dist.1997). In short, " 'good faith on the part of the * * * officers is not enough.' If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *See Beck v. Ohio*, 379 U.S. 89, 97 (1964), quoting *Henry v. United States*, 361 U.S. 98, 102 (1959).

{¶ 29} Here Lindsey relied on his own judgment in deciding to search Polk's bag based "solely" on rumors that Polk was a gang member. This act violated the Fourth Amendment, and the evidence obtained thereby could not be used in a subsequent criminal proceeding. No facts exist in this case to support the application of a "good-faith exception" to alter this conclusion. Appellant's assignment of error is overruled.

## IV. CONCLUSION

{¶ 30} Having overruled the state's sole assignment of error, we affirm the decision of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER, J., concurs in judgment only.
DORRIAN, P.J., concurs in part and dissents in part.

DORRIAN, P.J., concurring in part and dissenting in part.

{¶ 31} For the following reasons, I respectfully concur in part and dissent in part with the majority opinion.

{¶ 32} I concur with the majority that the initial search of the bag for safety and identification purposes was reasonable and justifiable. (Lead opinion, ¶ 12.) I also concur with the majority that, in a school setting, emptying the entire bag would have been an acceptable way to meet the two initial justifications for the search: safety and identification. (Lead opinion, ¶ 16.)

{¶ 33} However, I respectfully dissent from the majority's conclusion regarding the second search. Because the trial court applied the wrong standard to the second search, I dissent from the majority and would remand this case to the trial court for application of the correct standard. The trial court quoted from the United States Supreme Court opinion in *N.J. v. T.L.O.*, 469 U.S. 325, 341-42 (1985), and correctly stated that:

> Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the * * * action was justified at its inception,' *Terry v. Ohio*, 392 U.S. [1,] 20 [(1967)]; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place' *Ibid.* Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

(*See* Sept. 29, 2014 Decision and Entry, 3.)   However, when considering the second search, the trial court applied the test outlined in *T.L.O.* for the initial search.  The court stated:

> In order to justify the second and more intrusive search given these particular facts (i.e. dumping out the entire contents of the book bag), Officer Lindsay must have had "reasonable grounds" for suspecting that the search would turn up evidence that the Defendant had violated or was violating either school rules or the law.  While the standard for school searches is lower than that of probable cause, it requires more than "vague unsubstantiated reports." *Commonwealth vs. Cass*, 446 Pa.Super.66 at 75 (1995).

 (Decision and Entry, 4.) The trial court concluded that:

> [T]he second search was conducted solely based on the identity and reputation of the owner. *This does not equate to "reasonable grounds" for suspecting the violation of school rules or the law.*

(Emphasis added.) (Decision and Entry, 4.)

{¶ 34} Because the court's question regarding the second search should have been whether the measures adopted were reasonably related to the objectives of the initial search (safety and identification) and whether the search was not excessively intrusive in light of the age and sex of the student and the nature of the infraction, I would remand the

case to the trial court to consider the same. *See State v. Adams*, 5th Dist. No. 01 CA 76, 2002-Ohio-94 ("[t]he second element that must be considered in determining the reasonableness of a search by a school official is whether '* * * the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place * * *." ' *T.L.O.*, 469 U.S. at 341. This requires that the '* * * measures adopted * * * [be] reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.' *Id.* at 342.").

{¶ 35} Remanding the case to the trial court would moot, at this time, the question of whether the exclusionary rule applies in the public school context and particularly in this case. Nevertheless, regarding the discussion of the exclusionary rule, I feel compelled to note that I disagree with the majority's suggestion that the *T.L.O.* case already determined the issue of whether the exclusionary rule applies in a school setting to school officials. In suggesting the same, the majority states that "[the argument that the exclusionary rule should not apply to the school setting or school officials] has not been accepted by the United States Supreme Court." (Lead opinion, ¶ 20.) In support of this conclusion, the majority points to Justice Stevens' concurring in part and dissenting in part opinion in *T.L.O.*[4] *Id.*

{¶ 36} Contrary to the majority's suggestion, however, in footnote 3 of the *T.L.O.* majority opinion, the United States Supreme Court expressly stated:

> In holding that the search of T.L.O.'s purse did not violate the Fourth Amendment, we do not implicitly determine that the exclusionary rule applies to the fruits of unlawful searches conducted by school authorities. The question whether evidence should be excluded from a criminal proceeding involves two discrete inquiries: whether the evidence was seized in violation of the Fourth Amendment, and whether the exclusionary rule is the appropriate remedy for the violation. Neither question is logically antecedent to the other, for a negative answer to either question is sufficient to dispose of the case. Thus, our determination that the search at issue in this case did not violate the Fourth Amendment implies no

---

[4] Justice Stevens stated: "The State of New Jersey sought review in this Court, first arguing that the exclusionary rule is wholly inapplicable to searches conducted by school officials, and then contending that the Fourth Amendment itself provides no protection at all to the student's privacy. The Court has accepted neither of these frontal assaults on the Fourth Amendment." *T.L.O.* at 371, Justice Stevens concurring in part and dissenting in part. (Justice Marshall and Justice Brennan joining.)

particular resolution of the question of the applicability of the exclusionary rule.

{¶ 37} The question of whether the exclusionary rule applies in the public school setting is a question yet to be determined by the United States Supreme Court and thus far has not been considered or answered by the Supreme Court of Ohio or this court. While I agree that it is an important question which deserves careful consideration, I would not begin the discussion with the suggestion that the United States Supreme Court in *T.L.O.* has already answered the question.

{¶ 38} For these reasons, I concur in part and dissent in part.

————————